MICHAEL N. FEUER, City Attorney
THOMAS H. PETERS, Chief Deputy City Attorney (SBN 163383)
A. PATRICIA URSEA, Deputy City Attorney (SBN 221637)
**SARA UGAZ,** Deputy City Attorney (SBN 239031)
200 N. Main Street, City Hall East, Rm. 675
Los Angeles, CA 90012
Telephone (213) 978-7564

Attorneys for Defendant CITY OF LOS ANGELES

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VENICE JUSTICE COMMITTEE, an unincorporated association; and PEGGY KENNEDY, an individual;<br><br>                  Plaintiffs,<br><br>        v.<br><br>CITY OF LOS ANGELES; and DOES 1-10,<br><br>                  Defendants. | CASE NO: CV 16-01115-DDP (SSx)<br>[Assigned to Hon. Dean D. Pregerson, Courtroom 3]<br><br>**DEFENDANT CITY OF LOS ANGELES'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' COMPLAINT**<br><br>Date:  August 1, 2016<br>Time:  10:00 a.m.<br>Courtroom:  3<br><br>[Concurrently filed with Defendant's Notice of Motion and Motion to Dismiss Plaintiffs' Complaint and [Proposed] Order] |

DEFENDANT CITY OF LOS ANGELES'S REQUEST FOR JUDICIAL NOTICE

1    Pursuant to FEDERAL RULE OF EVIDENCE 201(b), Defendant City of Los Angeles

2  hereby seeks judicial notice of the following documents:

3    **Exhibit 1:** Los Angeles Municipal Code section 42.15.

4    **Exhibit 2:** The Central District Court's opinion in the case of *Dowd v. City of L.A.*, 2013

5  U.S. Dist. LEXIS 111435 (C.D. Cal. Aug. 7, 2013), CV 09-06731.

6    **Exhibit 3:** Ordinance number 179807, entitled "Vending and Excessive Noise on

7  Beaches Prohibited," that Los Angeles City Council passed on April 9, 2008.

8    **Exhibit 4:** The Plaintiffs' Complaint, filed in the case of *Dowd v. City of L.A.*, CV 09-

9  06731, Docket No. 1, filed September 16, 2009.

10    Under Federal Rule of Evidence 201, a court may take judicial notice of laws and city

11  ordinances because they are matters of public record. *See Santa Monica Food Not Bombs v.*

12  *City of Santa Monica*, 450 F.3d 1022, 1025 n. 2 (9th Cir. 2006). This rule also allows a court to

13  take judicial notice of complaints and other documents from court dockets, as documents that

14  can be readily authenticated. *See Macklin v. Hollingsworth*, 2014 U.S. Dist. LEXIS 125365,

15  *5-6 (E.D. Cal. Sept. 8, 2014). Exhibits 1 and 3 are thus proper subjects of judicial notice.

16  Similarly, this Court can take judicial notice of prior court proceedings, including district court

17  decisions. *See, e.g., Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1198 (9th Cir. 1988).

18  Accordingly, Exhibits 2 and 4 are also proper subjects of judicial notice.

19

20

21

22

23

24

25

26

27

28                                               1

DEFENDANT CITY OF LOS ANGELES'S REQUEST FOR JUDICIAL NOTICE

For all these reasons, Defendant's request for judicial notice of Exhibits 1-4 should be granted.

DATED: June 6, 2016          MICHAEL N. FEUER, City Attorney
                             THOMAS H. PETERS, Chief Asst. City Attorney
                             SARA UGAZ, Deputy City Attorney


                   By:    /s/ Sara Ugaz
                             SARA UGAZ
                             Deputy City Attorney
                             Attorneys for Defendant
                             CITY OF LOS ANGELES

2

EXHIBIT 1

**SEC. 42.15.  VENDING AND EXCESSIVE NOISE ON BEACHES PROHIBITED.**
**(Amended by Ord. No. 181,963, Eff. 1/20/12.)**

A.  **Definitions.** For purposes of this Section, the following words or phrases shall have the following meanings:

1.  **Board.** The Board of Recreation and Park Commissioners of the City of Los Angeles.

2.  **Boardwalk.** The Boardwalk is the manmade promenade that runs parallel to the beach and is designated or referred to as "Ocean Front Walk" or just the "Boardwalk". The Boardwalk runs from the City of Santa Monica on the north to the City of El Segundo on the south. A map depicting the Boardwalk is available for inspection and copying at the Police Substation or at the Recreation Office.

3.  **City.** The City of Los Angeles, a municipal corporation.

4.  **Designated Space or Designated Spaces.** A Designated Space or Designated Spaces are the 205 areas on the Boardwalk designated by the City and located between Navy Street on the north and 17th Avenue on the south. A map depicting the Designated Spaces is available for inspection and copying at the Police Substation or at the Recreation Office.

5.  **Department.** The Department of Recreation and Parks of the City of Los Angeles.

6.  **Donation.** A gift; a voluntary act which is not required and does not require anything in return.

7.  **Food.** Any type of edible substance or beverage.

8.  **Goods or Merchandise.** Any items that are not food.

9.  **Handcrafts.** Objects made either by hand or with the help of devices used to shape or produce the objects through such methods as weaving, carving, stitching, sewing, lacing, and beading including objects such as jewelry, pottery, silver work, leather goods, and trinkets. Most Handcrafts have more than nominal utility apart from any communicative value they possess. Most commonly, Handcrafts do not communicate a message, idea, or concept to others, are often mass produced or produced with limited variation. Handcrafts do not include visual arts.

10.  **Pagodas.** The shade structures and seating, plus the area within a ten foot radius around each of the shade structures and seating, located on the Boardwalk at Clubhouse Avenue, Breeze Avenue, Park Avenue, Sunset Avenue and Dudley Avenue. A map depicting the Pagodas is available for inspection and copying at the Police Substation or at the Recreation Office.

11.  **Perform, Performing, Performance or Performances.** To engage in any of the following activities on public property: playing musical instruments, singing, dancing, acting, pantomiming, puppeteering, juggling, reciting, engaging in magic, creating visual art in its entirety, presenting or enacting a play, work of music, work of art, physical or mental feat, or other constitutionally protected entertainment or form of expression. The terms Perform, Performing, Performance or Performances shall not include:

(a)  The application of substances to others' skin, including but not limited to, paints, dyes and inks;

(b)  The provision of personal services such as massage or hair weaving, cutting or styling;

(c)  the completion or other partial creation of visual art;

(d)  the creation of visual art which is mass produced or produced with limited variation; or

(e)  the creation of Handcrafts.

12.  **Performer.** A Performer is a Person who Performs. Performer includes the employers, employees, and agents of a Performer. Indicia of being a performer include, but are not limited to, setting up performance equipment, staging or orienting the performance towards the public, performing in the same location for an extended period of time, performing in the public over multiple days, seeking voluntary contributions through passing around a hat or leaving open an instrument case or other receptacle, and soliciting donations after a performance.

13.  **Person or Persons.** One or more natural persons, individuals, groups, businesses, business trusts, companies, corporations, joint ventures, joint stock companies, partnership, entities, associations, clubs or organizations composed of two or more individuals (or the manager, lessee, agent, servant, officer or employee of any of them), whether engaged in business, nonprofit or any other activity.

14.  **Police Substation.** The Police Substation is the Los Angeles Police Department office building located at 17th Avenue and Ocean Front Walk.

15.  **Program Rules.** Rules adopted by the Board pursuant to its Charter authority and made applicable to use of the public space on and adjacent to the Boardwalk. The Program Rules will be adopted at a duly noticed public hearing at which the public is provided an opportunity to comment, as required by the Ralph M. Brown Act, at least ten (10) days prior to implementation. The Program Rules, as may be amended from time-to-time by the Board, shall be available for inspection and copying at the Police Substation or at the Recreation Office.

16.  **Pushcart.** Any mobile device that holds Food or Goods or Merchandise, as defined in this Subsection, and is used to vend.

17.  **Recreation Area.** The area between Horizon and 20th Avenues that includes the Boardwalk, grassy areas, the Police Substation, which is co-located with an office of the City's Department of Recreation and Parks, Muscle Beach, paddle tennis courts, skate park, skate plaza and other recreational facilities. This does not include the area west of the Boardwalk immediately adjacent to this area. A map of the Recreation Area is available for inspection and copying at the Police Substation or at the Recreation Office.

18.  **Recreation Office.** The Recreation Office is an office of the City's Department of Recreation and Parks that is physically co-located with the Police Substation at 17th Avenue and Ocean Front Walk.

19.  **Sunset.** Sunset is the time at which the sun's disk descends below the western horizon. The precise moment of Sunset can be determined by reference to various, publicly available almanacs and newspapers of general circulation in Los Angeles.

20.  **Vend or Vending.** To sell, offer for sale, expose or display for sale, solicit offers to purchase, or to barter Food, Goods or Merchandise, or services in any area from a stand, table, Pushcart, motor vehicle, bicycle, or by a Person with or without the use of any other device or other method of transportation, or to require someone to pay a fee or to set, negotiate, or establish a fee before providing Food, Goods or Merchandise, or services, even if characterized by the Vendor as a Donation.

21.  **Vendor.** A Vendor is a Person who Vends. Vendor includes the employers, employees, and agents of a Vendor.

22.  **Westside of the Boardwalk.** The area on the ocean-side of the Boardwalk. A map depicting the Westside of the Boardwalk is available for inspection and copying at the Police Substation or at the Recreation Office.

B.  **Findings and Purposes.** The City Council of the City of Los Angeles finds and declares as follows:

1.  The Boardwalk and Recreation Area constitute a major tourist attraction in the City, hosting approximately 16 million visitors annually. The Boardwalk and Recreation Area are limited spaces geographically, located in a narrow, linear City park that is bounded by the beach to the West and private property to the East. The total width of the Boardwalk is only ten feet in certain sections and only as wide as 50 feet in other limited areas. The space is further constrained by the fact the Boardwalk and Recreation Area serve as emergency ingress and egress routes.

2.  Historically, visitors, including tourists, have been drawn to Venice beach because, the Boardwalk and Recreation Area served as a traditional public forum for performance and visual artists, as well as other free speech activity. Vendors of Food, Goods and Merchandise viewed the large crowds of visitors to the Boardwalk and Recreation Area as a pool of potential customers and Vending proliferated. As the numbers of commercial Vendors increased, the number of Performers and persons engaging in free speech activities decreased both because of the limited amount of space and because of the change in atmosphere from a vibrant center of art and expression to a commercial "flea market" atmosphere. Competing interests for space on the Boardwalk and Recreation Area intensified and physical altercations for space and disturbances of the peace resulted in law enforcement responses and arrests.

3.  Unregulated Vending and Performances adversely affect the historic character of the Boardwalk, hamper rather than encourage a wide variety of performances, visual artists and other free speech activity, as well as jeopardize the public safety of visitors to the Boardwalk, resulting in an economic and cultural loss to the City. Therefore, the Boardwalk requires reasonable time, place, and manner restrictions to retain its unique historic character as a center of performance, art, and other free speech activity, preserve its status as a tourist attraction, protect the commercial life of the Boardwalk, and ensure the safety and enjoyment of residents, visitors, advocates, artists, performers, and Vendors alike. Due to its unique historical, geographical, and physical characteristics, the Boardwalk requires its own set of rules and regulations different from other public parks in the City.

4.  Unregulated Vending and Performing harms the Boardwalk, and therefore must be regulated because:

(a)  Tourists are deterred from visiting or shopping at the Boardwalk as they are constantly approached, solicited, and sometimes harassed by unregulated Vendors and Performers. Regulation is therefore necessary to manage the time, place, and manner of Vending on the Boardwalk, in order to ensure that tourists are not deterred from visiting or shopping at the Boardwalk;

(b)  The amount of space on the Boardwalk that is available for performing and visual artists and for political advocacy is limited due to the size of the Boardwalk and the large crowds of visitors that the Boardwalk attracts. Due to the limited amount of space, unregulated Vending along the Boardwalk prevents many Persons from engaging in performance, art, advocacy or other expressive activities. The lack of regulations for Vending, Performing and noise has resulted in conflicting claims for the available spaces. Numerous altercations occurred, in competition for locations and amounts of space, during time periods in which the City lacked regulations for noise and a system for allocating available space for Vending and Performing. Frequently, the altercations became violent requiring law enforcement response to preserve the public peace. Persons wishing to secure spaces often

arrive prior to dawn and create loud noise in setting up their displays, thereby disturbing the public peace, including the peace of the residents on and near the Boardwalk, and requiring a law enforcement response. Unregulated, the Boardwalk became a place where only the strongest and earliest arrivals could secure space to exercise their rights of free expression without threat of intimidation. Regulation is necessary, therefore, to manage the use of the limited space on the Boardwalk to prevent conflicting claims for the space and to allocate the limited space available fairly to all who desire to use it for lawful purposes;

(c)  Tables, Pushcarts, stands, and certain equipment of Vendors and Performers impede the orderly movement of pedestrian traffic along the narrow Boardwalk and may make the Boardwalk unsafe for pedestrians by limiting the City's ability to effect crowd management and control. Certain equipment of Vendors and Performers contributes to visual clutter and blight, especially when it impacts the ability of Boardwalk visitors to see the Pacific Ocean. Regulating the use of equipment by Vendors and Performers therefore is necessary to manage the orderly movement of pedestrian traffic. Regulation also is necessary to avoid injuries to pedestrians as well as ensure the existence of emergency and non-emergency ingress and egress between the beach and the Boardwalk;

(d)  The Vendors, Performers and their equipment impede the ingress and egress of emergency and public safety vehicles by creating physical obstacles to emergency response and administration of aid to those in need of immediate medical attention and to victims of criminal activity. Regulation is therefore necessary to ensure that Vendors, Performers and their equipment do not interfere with emergency response vehicles that provide assistance to individuals with medical needs and victims of criminal activity;

(e)  Unregulated Vending has resulted in the sale of stolen, defective or counterfeit merchandise. Regulation therefore is necessary to protect the public and the Boardwalk commercial life;

(f)  Unregulated Vending of personal services has resulted in activities that are illegal and harmful to human health, including the offering of services by unlicensed Vendors of services for which a license is required by the State of California, physical assaults and the application of toxic chemicals to Persons;

(g)  Unregulated Vending causes visual clutter/blight along the Boardwalk, impedes views of the beach and the Pacific Ocean, and threatens the City's ability to attract tourists and preserve businesses along the Boardwalk. Regulation therefore is necessary to manage the number of Vendors, the size of their equipment and displays, and the location of Vending activity;

(h)  Unregulated Vending creates unnecessary, excessive and annoying noise on the Boardwalk, is detrimental to the public health, welfare and safety and contrary to the public interest, harms residents, the commercial life of the Boardwalk and the historic character of the Boardwalk, and diminishes the quality of life for those who visit, live or work on or near the Boardwalk. Regulation therefore is necessary to establish restrictions on noise at the Boardwalk; and

(i)  The Recreation Area is a site that is uniquely suitable to and frequently used for events that require pre-planning and advanced notice. The Recreation Area is the location of the Police Substation where vehicles require the ability for unobstructed ingress and egress. Due to the size, shape, and physical attributes of the Recreation Area (including a skate park and plaza, paddle tennis courts and exercise equipment), it is also a site uniquely suitable to and used by many Persons for skateboarding, paddle tennis, and other sports and exercise. The Recreation Area is the home of historic "Muscle Beach", a popular tourist attraction. Muscle Beach is world renowned as home of physical fitness advocates and body builders, including Jack La Lanne (considered to be the father of the modern fitness movement), Arnold Schwarzenegger, Franco Columbo and Dave Draper.

C.  **Beach Vending Prohibition.** Except as specifically allowed in this Section, no Person shall engage in Vending upon any public beach lands or properties adjoining the waterfront of the Pacific Ocean, or upon any

immediately adjacent Boardwalk, sidewalk or public way between the southerly boundary of the City of Santa Monica and the northerly boundary of the City of El Segundo and between the northwesterly boundary of the City of Santa Monica and the northwesterly boundary of the City of Los Angeles.

   D.  **Vending and Performing on Designated Spaces.**  **(Amended by Ord. No. 183,170, Eff. 9/15/14.)** To address the findings and purposes set forth in this Section, the City has created reasonable time, place, and manner restrictions on Vending and noise, as well as to facilitate Performing.  To preserve the Boardwalk's rich history of fostering new artists, performance and other free speech activity, the City has divided the available space on the Boardwalk into 205 areas, known as Designated Spaces, where:

   1.  Persons can engage in traditional expressive speech and petitioning activities, and can Vend the following expressive items: newspapers, leaflets, pamphlets, bumper stickers, patches and/or buttons.

   2.  Persons can Vend the following items, which have been created, written or composed by the Vendor or Performer: books, audio, video or other recordings of their performances, paintings, photographs, prints, sculptures or any other item that is inherently communicative and is of nominal value or utility apart from its communication.

   3.  Although an item may have some expressive purpose, it will be deemed to have more than nominal utility apart from its communication if it has a common and dominant non-expressive purpose.  Examples of items that have more than nominal utility apart from their communication and thus are subject to the Vending ban under the provisions of this Section, include, but are not limited to, the following: housewares, appliances, articles of clothing, sunglasses, auto parts, oils, incense, perfume, crystals, lotions, candles, jewelry, toys and stuffed animals.

   4.  Vendors may not display items that may not be Vended pursuant to this Subsection.

   5.  Vendors may not provide free of charge any item that may not be Vended pursuant to this Subsection if the purchase of an item that may be lawfully Vended pursuant to this Subsection is a condition of receiving the free item.

   6.  Performers can Perform.

   7.  Any Vendor conducting lawful Vending under Subsections D.1. and D.2., above, must comply with applicable tax and licensing requirements.

   E.  **Allocation and Use of Designated Spaces.**  The City's Board of Recreation and Parks Commissioners shall designate a total of 205 spaces on the Boardwalk, referred to as the "Designated Spaces". The Designated Spaces will be available for use in accordance with a first-come, first-served system or any other legally permissible allocation system adopted by the Board at a duly noticed public hearing at which the public is provided an opportunity to comment, as required by the Ralph M. Brown Act, posted at the Recreation Office for at least ten (10) days prior to implementation.

   The 205 Designated Spaces shall be made available for the activities described in Subsection D. above. Five of the Designated Spaces shall be double-sized, large act spaces for Performers whose number of Performers plus audience can be anticipated to exceed 25 Persons. Two of the regular-sized Designated Spaces shall be made available for Persons engaging in any activity that is described in Subsection D. and who are predominantly giving away Food. The remainder of the regular-sized, Designated Spaces shall be made available for Persons engaging in any exempt activity described in Subsection D.

Persons using the 205 Designated Spaces are subject to, and shall comply with, the following restrictions and the Program Rules adopted by the Board:

1.  The five double-sized, large act Performer spaces historically have been used by Performers (such as acrobats) whose performances require more space than is available in a single-sized, Designated Space, and have been used by Performers who attract large crowds due to the nature of their performances. The five, double-sized, large act Performer spaces are the only spaces able to safely accommodate large scale performances or a large audience and, therefore, in order to facilitate a variety of Performances in these double-sized spaces, the Performer spaces are subject to a rotation requirement, whereby each Performer using one of the five Performer spaces shall relinquish the space on the hour, every hour, whenever another Performer is waiting to use the Performer space in which the Performer is Performing.

2.  No Person shall Vend any item in a Designated Space, except as expressly authorized by Subsection D.

3.  No Person shall place or allow anything in any Designated Space to extend beyond the boundaries of the Designated Space nor place anything adjacent to the Designated Space nor obstruct or impede the access areas between the Designated Spaces.

4.  No Person shall Vend in, Perform in, or place or allow any item to extend into a designated emergency ingress and egress area. A map depicting the emergency ingress and egress areas is available for inspection and copying at the Police Substation or at the Recreation Office.

5.  The City desires to balance the goal of avoiding visual clutter and blight against the need of Performers and Vendors exempt pursuant to Subsection D., above, to have shade from the sun. Additionally, the City desires to balance the goal of avoiding visual clutter and blight against the desire of Performers and Vendors exempt pursuant to Subsection D., above to use equipment common to exempted Performing and Vending activities. Accordingly, the following rules relating to shade, Performing and Vending equipment: are adopted as follows: No Person shall place or allow any item (except an umbrella, sun shade, easel, display board or microphone stand) exceeding four feet above ground in any Designated Space, nor shall any Person cause or allow a Designated Space to be enclosed. An umbrella or sun shade shall not exceed 8 feet above ground and shall be open on all sides. An easel, display board or microphone stand shall not exceed 6 feet in height. Persons shall not hang objects of any nature on or from any umbrella, sun shade, easel or display board.

6.  No Person occupying a Designated Space shall leave that Designated Space for a period longer than 45 consecutive minutes without first removing all items from the Designated Space.

7.  No Person shall occupy more than one single regular-sized or double-sized Designated Space at any given time, nor shall any Person solicit another Person to obtain or occupy a Designated Space on his or her behalf.

8.  No Person shall purchase, sell, barter or exchange any Designated Space with any other Person.

9.  No Person shall set up or set down items in, take down items from or block, or attempt to reserve a Designated Space between Sunset and 9:00 a.m.

10.  Any umbrella used in connection with the activities authorized in the Designated Spaces must be adequately secured in an upright position with a diameter no greater than 8 feet.

11.  Designated Spaces must be kept clean and free of litter and debris. No permanent markings shall be made in any Designated Space. Any temporary marking made in any Designated Space must be removed from the

Designated Space when the Person using the Designated Space vacates the Designated Space or by Sunset, whichever is earlier.

12.   No open flames combustible fuel or gasoline-fueled generators are allowed in any Designated Space. Electric cords may not be connected outside the assigned space or to any City or private power source.

**F.   Special Rules for Other Areas of the Boardwalk.**

1.   **Areas Outside of the Designated Spaces, Pagodas, and Recreation Area.**

(a)   **Areas where use of equipment is prohibited.** The activities described in Subsection D. may occur in all areas covered by this Section outside the Designated Spaces, Pagodas, and Recreation Area, provided that no Person may set up a display table, easel, stand, equipment or other furniture, use a Pushcart or other vehicle or place any item on the property defined in Subsection C. except as provided in Paragraph (b) of this Subdivision.

(b)   **Areas where limited use of equipment is permitted.** The activities described in Subsection D., but not including Vending, may occur on the Westside of the Boardwalk outside the Designated Spaces, Pagodas, Recreation Area and other areas designed as access points for or constitute routes for emergency ingress and egress. In connection with permissible activities in the area on the Westside of the Boardwalk, outside the Designated Spaces, Pagodas, Recreation Area and other areas designated for emergency ingress and egress, a Person may set up a display table, easel, stand, equipment or other furniture, a Pushcart or other vehicle, or place an item on the ground in the areas where limited use of equipment is permitted, subject to reasonable size and height restrictions set forth in paragraph E.5., herein, provided the equipment or the activity associated with the equipment does not materially impede or obstruct pedestrian or vehicular traffic or areas designed for emergency ingress and egress. Nothing in this paragraph shall be construed to allow a person to use or set up equipment in connection with Vending.

(c)   The areas in which use of equipment is prohibited and areas in which limited use of equipment is permitted is available for inspection and copying at Police Substation or Recreation Office.

2.   **The Recreation Area.**

(a)   The Recreation Area is a limited space containing a confluence of public safety ingress and egress routes, and at which pre-planned events, recreation activities and tourism occur. The City's Board of Recreation and Parks Commissioners may allocate use of the Recreation Area through the adoption of Program Rules detailing an advance reservation system or any other legally permissible allocation system, and the advance reservation system or other legally permissible allocation system contained in the Program Rules will be adopted by the Board at a duly noticed public hearing at which the public is provided an opportunity to comment, as required by the Ralph M. Brown Act, and made effective after reasonable public notice by posting at the Recreation Office for at least ten (10) days prior to implementation. A copy of the Program Rules shall be available for inspection and copying at the Police Substation or the Recreation Office.

(b)   No Vending, and no display tables, easels, stands, equipment, Pushcarts or other vehicles, or structures shall be allowed in the Recreation Area except as may be expressly authorized by the Board in connection with the Board's pre-approval of the use of the Recreation Area.

(c)   No Person shall use the Recreation Area or any part of the Recreation Area while the Recreation Area or that part of the Recreation Area has been reserved, set aside, is being used, set up, maintained or designed for a specific recreational purpose, park purpose or event authorized by the City through the Department or Board. When the City, through the Department or Board, has reserved, intends to use, set up, maintain or designate the

Recreation Area or any part of the Recreation Area for a specific recreational purpose, park purpose or event, the Department will make available for inspection and copying at the Police Substation or Recreation Office information describing the nature of the authorized park purpose or event, the location of the park purpose or event and the times during which the park purpose or event will take place.

G. **Use of City Property for Vending, Performing, or Display Prohibited.** No Person shall use or obstruct access to any City-owned or maintained property or equipment, including, but not limited to, street furniture, benches, planters, trash receptacles, Pagodas or other structures or equipment installed on public property, for Vending, Performing, or display of anything whatsoever.

H. **Noise Regulation for all Property on or Abutting the Boardwalk.**

1. No Person whether on the Boardwalk or on private or public property abutting the Boardwalk shall create any noise, or allow the creation of any noise, which causes the noise level to exceed the following Lmax levels between 9:00 a.m. and Sunset:

(a) 75 dBA, when measured at a minimum distance of 25 feet from the source of the noise; or,

(b) 96 dBA, when measured at a minimum distance of one foot from the source of the noise.

When Lmax levels are measured for noise emanating from a building located on private property adjacent to the Boardwalk, the measurement shall be taken from the property line dividing the private property and the Boardwalk.

2. Nothing in this Section shall be construed as prohibiting the City from enforcing other provisions of this Code regulating noise and sound levels. At all times, the noise and sound provisions of Chapter 11 of the Los Angeles Municipal Code, Articles 1 through 5, inclusive, and Los Angeles Municipal Code Sections 63.44 B.6., 41.42, 41.57, 53.63 shall apply.

3. No Person shall interfere with or resist the taking of any noise measurement authorized by this Section.

I. **Violations. (Amended by Ord. 183,170, Eff. 9/15/14.)** Any Person violating a provision of this Section shall be subject to the following penalties:

1. **First violation.** A first violation of this Section shall be an infraction punishable by a fine in the amount of $100.

2. **Second and subsequent violations.** A second violation and all subsequent violations shall be subject to the provisions of Section 11.00 of the Los Angeles Municipal Code, including prosecution as an infraction punishable by a fine in the amount of $250, or prosecution as a misdemeanor punishable by a fine of not more than $1,000 or by imprisonment in the County Jail for a period of not more than six months, or by both a fine and imprisonment.

3. The following constitute violations for purposes of this Subsection: A conviction for violation of this Section, a conviction under California Penal Code Section 853.7 for failure to appear in court to contest a citation for violation of this Section, or a forfeiture of bail.

4. Nothing in this Section shall be construed as prohibiting the City from enforcing any and all other provisions of this Code or other applicable laws. At all times, Los Angeles Municipal Code Section 63.44, which regulates the use of park and recreational facilities, shall apply.

J.   **Other Applicable Opening and Closing Hours.** Nothing in this Section amends or extends the opening or closing hours otherwise established by law for any area subject to this Section.

K.   **Posted Notice.** The City shall post signs providing notice of the existence of rules for the allocation and use of the Designated Spaces, Recreation Area and Boardwalk areas near the entrances to the Designated Spaces and the Recreation Area. A complete copy of this Section shall be available for inspection and copying at the Police Substation or at the Recreation Office.

L.   **Severability.** If any portion, subsection, sentence, clause or phrase of this Section is for any reason held by a court of competent jurisdiction to be invalid, such a decision shall not affect the validity of the remaining portions of this Ordinance. The City Council hereby declares that it would have passed this Section and each portion or subsection, sentence, clause and phrase herein, irrespective of the fact that any one or more portions, subsections, sentences, clauses or phrases be declared invalid.

EXHIBIT 2



**MATTHEW DOWD; PETER DEMIAN; EDWARD LA GROSSA; ANTHONY BROWN; NATHAN PINO, WILLIE LEE TURNER; DAVID "ZUMA DOGG" SALTSBURG; THOMAS BURRUM JNR; MARVIN SIMS; JESSE BROWN; LOUIE GARCIA; RENE CASTRO, Plaintiff, v. CITY OF LOS ANGELES, a municipal corporation, Defendants.**

**Case No. CV 09-06731 DDP (SSx)**

**UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**2013 U.S. Dist. LEXIS 111435**

**August 7, 2013, Decided**
**August 7, 2013, Filed**

**SUBSEQUENT HISTORY:** Costs and fees proceeding at, Motion granted by Dowd v. City of Los Angeles, 2014 U.S. Dist. LEXIS 91096 (C.D. Cal., May 23, 2014)

**COUNSEL:** [*1] For Matthew Dowd, an individual, Peter Demian, an individual, Edward LaGrossa, an individual, Anthony Brown, an individual, Nathan Pino, an individual, Willie Lee Turner, an individual, David Saltsburg, an individual also known as Zuma Dogg, Louie Garcia, an individual, Rene Castro, an individual, Plaintiffs: Stephen F Rohde, Rohde and Victoroff, Los Angeles, CA.

For City of Los Angeles, a municipal corporation, Defendant: Laurie Rittenberg, LEAD ATTORNEY, Los Angeles City Attorney's Office, Los Angeles, CA; David W Skinner, Dawn A McIntosh, Deborah J Fox, Margaret W Rosequist, Meyers Nave Riback Silver and Wilson, Los Angeles, CA.

**JUDGES:** DEAN D. PREGERSON, United States District Judge.

**OPINION BY:** DEAN D. PREGERSON

**OPINION**

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' AND DEFENDANT'S CROSS MOTIONS FOR SUMMARY JUDGMENT**

[Dkt. Nos. 158 & 168]

Presently before the court are Plaintiffs' and Defendant's Cross Motions for Summary Judgment. Having considered the parties' submissions, heard oral argument, and ordered supplemental briefing, the court adopts the following order.

**I. BACKGROUND**

**A. Factual History**

The Venice Beach Boardwalk (the "Boardwalk") is a major tourist attraction in the City of Los Angeles. LAMC § 42.15(A)(1)(a). [*2] It is "historically significant as a traditional public forum for its performance and visual artists, as well as other free speech activity." Id. During the summer and on weekends, the Boardwalk is filled with street performers, including "instrumental musicians, singers, jugglers, acrobats, mimes, comics, magicians, prophets, fortune

tellers, and other assorted entertainers." City of Los Angeles Dep't of Recreation & Parks, http://www.laparks.org/venice/venice.htm (last visited Nov. 8, 2009). Plaintiffs are thirteen street performers and artists who make their living on the Venice Beach Boardwalk by, among other things, dancing, singing, painting, unicycling, playing music, as well as selling or accepting donations for items related to their performances, such as CDs, works of art, and T-shirts.

Over the years, the defendant the City of Los Angeles (the "City"), has adopted and amended a number of versions of Los Angeles Municipal Code ("LAMC") § 42.15, in order to address its concern that unregulated vending negatively effects the character, safety, and economic vitality of the Venice Beach Boardwalk and in response to litigation. In 2005, the City suspended the 2004 version of § 42.15, [*3] in response to the legal challenge raised in Venice Food Not Bombs v. City of Los Angeles, No. CV 05-04998 DDP (SS) (CD. Cal. 2005), and later adopted an amended version of the ordinance as part of a settlement agreement in 2006. The settlement agreement was the culmination of intensive meetings and negotiations between the parties and community stakeholders, with the aid of the Court, in an effort to draft an ordinance that would address the City's concerns about unregulated vending while protecting the rights of those who engage in activities protected by the First Amendment on Venice Boardwalk.

The City's adoption of the 2006 version of § 42.15 did not end all controversy concerning the vending ordinance and further litigation ensued. On January 14, 2009, this Court ruled in Hunt v. City of Los Angeles, 601 F. Supp. 2d 1158, 1170-72 (C.D. Cal. 2009), that the 2004 version of LAMC § 42.15(C) was unconstitutionally vague, because the exception to the vending ban for "merchandise constituting, carrying or making a religious political, philosophical, or ideological message or statement which is inextricably intertwined with merchandise," presented "a real risk of arbitrary and discriminatory [*4] enforcement because it fail[ed] to provide sufficient guidance to those who would enforce it." The Court did not reach the merits of the plaintiffs' facial void-for-vagueness challenge to a similar provision in the 2006 version of the ordinance, finding that the plaintiffs lacked standing to raise the claim. Hunt, 601 F. Supp. 2d at 1175.

In the face of such litigation, the City again amended

§ 42.15, with the latest draft taking effect on May 19, 2008. In enacting the 2008 version of LAMC § 42.15, the City found that (1) tourists are deterred from visiting the Boardwalk because they are harassed by unregulated vendors, (2) the limited amount of space on the Boardwalk should be assigned in order to avoid frequent altercations, (3) vendors and their equipment impede the ingress and egress of emergency and public safety vehicles, and (4) unregulated vending creates excessive and annoying noise on the Boardwalk that negatively affects nearby workers, visitors, and residents. LAMC § 42.15(A)(1)(b)(i)-(vii). In response to these findings, LAMC § 42.15 (2008) provides that "[e]xcept as specifically allowed in this section, no person shall engage in vending" along the Venice Beach Boardwalk. [*5] Id. § 42.15(A).

The 2008 version of the ordinance divides much of the available space in the heart of the Boardwalk into individual spaces designated as P-Zone spaces and I-Zone spaces. Id. § 42.15(2). In the P-Zone spaces, "persons can perform, engage in traditional expressive speech, and petitioning activities, and vend the following expressive items: newspapers, leaflets, pamphlets, bumper stickers, patches, buttons, or books created by the vendor or recordings of the vendor's own performances . . . ." Id. § 42.15(2)(a). In the I-Zone spaces, "persons may engage in activities permissible in the P-Zone, and also engage in vending of expressive items created by the vendor, or the vending of expressive items that are inextricably intertwined with the vendor's message . . . ." Id. § 42.15(2)(b).

With certain limited exceptions, anyone wishing to use a P-Zone or I-Zone space during Peak Season must apply for an annual permit and enter into a lottery system by which spaces are assigned each day. Program Rules at pp. 2-3. The person to whom the space is assigned has priority to use the space. But, after 12:00 p.m., anyone (with or without a permit) may use any unoccupied space, so long as [*6] she engages only in activities approved for the P-Zones and relinquishes the space to the permit-holder if she returns.

Outside of the P- and I-Zones, anyone may engage in any activity permitted in the P-Zones and vend expressive items "inextricably intertwined with the vendor's message," so long as she does not "set up a display table, easel, stand, equipment, or other furniture, use a pushcart or other vehicle . . . ." Id. § 42.15(D)(1)(a). On the West

side of the Boardwalk, outside of the P- and I-Zones, anyone can engage in any permitted P-Zone activity as long as it is "not vending and does not substantially impede or obstruct pedestrian or vehicular traffic, subject to reasonable size and height restrictions on any table, easel, or other furniture . . . ." Id. § 42.15(D)(1)(b).

The ordinance and Program Rules also include noise regulations. LAMC § 42.15(F)(1) provides that noise levels must not exceed seventy-five decibels when measured at a distance of twenty-five feet away or ninety-six decibels when measured from one foot away between nine o'clock in the morning and sunset. Furthermore, LAMC § 42.15(F)(4) bans the use of amplified sound anywhere on the Boardwalk except in specially [*7] designated P-Zone spaces between 17th Avenue and Horizon Avenue and between Breeze Avenue and Park Avenue. The Program Rules clarify that amplified sound "is permitted only in the designated spaces in the P-Zones in the locations specified in Section 42.15 between 9:00 a.m. and sunset, and is prohibited after sunset and before 9:00 a.m." Program Rules at p. 4.

Following the City's adoption of the 2008 version of § 42.15, the Ninth Circuit decided Berger v. City of Seattle, 569 F.3d 1029 (9th Cir. 2009) (en banc), holding that a designated-performance-space and permitting system established by the City of Seattle for the Seattle Center was facially unconstitutional under the First Amendment. In so holding, the court noted that the Supreme Court "has repeatedly concluded that single-speaker permitting requirements are not a constitutionally valid means of advancing [the government's] interests because, typically (1) they sweep too broadly, (2) they only marginally advance the government's asserted interests, and (3) the government's interests can be achieved by less intrusive means." Id. at 1038 (internal citations omitted). While acknowledging that such Supreme Court decisions involved [*8] permitting requirements for door-to-door solicitation, the court held that "it stands to reason that such [single-speaker permitting] requirements would be at least as constitutionally suspect when applied to speech in a public park, where a speaker's First Amendment protections reach their zenith, than when applied to speech on a citizen's doorstep where substantial privacy interests exist." Id. at 1039. As a result, the court stated that it was "not surprising that we and almost every other circuit to have considered the issue have refused to uphold registration requirements that apply to individual speakers or small groups in a public forum." Id.

Shortly after the Ninth Circuit published its decision in Berger, 569 F.3d 1029, Plaintiffs filed this lawsuit raising facial and as-applied challenges to the 2006 and 2008 versions of LAMC §42.15 and its implementing Public Expression Permit Program Rules ("Program Rules") (revised April 2, 2008), arguing that they violate the First and Fourteenth Amendments. The facial challenges to the 2008 ordinance at issue here appear to be threefold: First, Plaintiffs argue that the permitting and designated performance space system is not a reasonable [*9] time, place and manner restriction and grants unbridled discretion to licensing authorities. Second, Plaintiffs assert that the ordinance's use of the phrase "inextricably intertwined" renders it unconstitutionally vague. Third, Plaintiffs claim that the amplified sound ban is not a reasonable time, place, and manner restriction.

In order to voice their concerns over the ordinance and its enforcement, Plaintiffs Dowd and Saltsburg began attending Los Angeles City Council meetings and speaking during public comment sessions. Plaintiffs Dowd and Saltsburg raise facial and as-applied challenges to the City Council's Rules of Decorum.

**B. Procedural History**

On October 8, 2009, the City filed a motion to dismiss the facial challenges to LAMC § 42.15 (2008) on the grounds that the ordinance is constitutional on its face. The court denied the motion to dismiss with respect Plaintiffs' facial challenge to the permitting system and the amplified sound ban, and granted it with respect to Plaintiffs' facial challenge to the vending ban, holding that they did not have standing to pursue such a claim. On October 16, 2009, Plaintiffs filed a motion for preliminary injunction. The court granted the injunction [*10] as to the amplified sound ban and the permitting and lottery system, and denied it as to the rules of decorum, the limitation of boardwalk activities at sunset, the height prohibition, and the rotation requirement.

The parties have now filed cross-motions for summary judgment on the constitutionality of the 2008 Ordinance, the amplified sound ban, the limitation of boardwalk activities after sunset, the height limitation, and the rules of decorum.

**II. LEGAL STANDARD**

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). All reasonable inferences from the evidence must be drawn in favor of the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). [*11] If the moving party does not bear the burden of proof at trial, it is entitled to summary judgment if it can demonstrate that "there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

Once the moving party meets its burden, the burden shifts to the nonmoving party opposing the motion, who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. Summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. There is no genuine issue of fact "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

It is not the court's task "to scour the record in search [*12] of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996). Counsel has an obligation to lay out their support clearly. Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001). The court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." Id.

## III. DISCUSSION

### A. 2006 Ordinance

The statute of limitations for suits under 42 U.S.C. § 1983 is governed by state law applying to tort actions for the recovery of damages for personal injuries. Silva v. Crain, 169 F.3d 608, 610 (9th Cir. 1999). In California, the statute of limitations for such personal injuries is two years. Cal. Civ. Proc. Code § 335.1. "Generally, the statute of limitations begins to run when a potential plaintiff knows or has reason to know of the asserted injury." Action Apartment Ass'n, Inc. v. Santa Monica Rent Control Bd., 509 F.3d 1020, 1026-27 (9th Cir. 2007), quoting De Anza Properties X, Ltd. v. County of Santa Cruz, 936 F.2d 1084, 1086 (9th Cir. 1991). For facial challenges, the two year statute of limitations [*13] runs from the date that the challenged statute or ordinance went into effect, regardless of when a plaintiff learns of the enactment. Action Apartment Ass'n, Inc., 509 F.3d at 1027 (9th Cir. 2007)(internal citation and quotation marks omitted) ("Given the general rule that the statute of limitations begins to run when a potential plaintiff knows or has reason to know of the asserted injury, it stands to reason that any facial injury to any right should be apparent upon passage and enactment of a statute.")

The 2006 Ordinance became effective on March 25, 2006. (City Mot., Exh. 301.) Plaintiffs filed this action on September 16, 2009. Thus, their facial challenge to the 2006 Ordinance was filed more than a year after the statute of limitations period had expired and such a challenge is time-barred.

The as-applied claims are likewise time-barred. Any acts that took place prior to September 16, 2007, and that give rise to an as-applied challenge would be time-barred. Because the 2006 Ordinance was suspended in July 2007 (FAC ¶ 50), any act of enforcement of the 2006 Ordinance would have taken place prior to July 2007, and would necessarily be time barred.

For these reasons, the court GRANTS [*14] summary judgment in favor of Defendant on all claims relating to the 2006 ordinance.

### B. Permit and Lottery System

"A permitting requirement is a prior restraint on speech and therefore bears a 'heavy presumption' against

its constitutionality." Berger, 569 F.3d at 1037 (internal citation omitted). "The presumptive invalidity and offensiveness" of such systems "stem from the significant burden they place on free speech. Both the procedural hurdle of filling out and submitting a written application, and the temporal hurdle of waiting for the permit to be granted may discourage potential speakers." Id. at 1037-38 (internal citation and quotation marks omitted). Even where the government has a significant interest, the Supreme Court has concluded that "single-speaker permitting requirements are not a constitutionally valid means of advancing those interests because, typically, (1) they sweep too broadly . . . (2) they only marginally advance the government's asserted interests, . . . and (3) the government's interests can be achieved by less intrusive means." Id. at 1038. "Although the Supreme Court has not addressed the validity of single-speaker permitting requirements for speech in a [*15] public forum, it stands to reason that such requirements would be at least as constitutionally suspect when applied to speech in a public park, where a speaker's First Amendment protections reach their zenith." Id. at 1039. The "venerable tradition of the park as public forum has . . . a very practical side to it as well: parks provide a free forum for those who cannot afford newspaper advertisements, television infomercials, or billboards." Grossman v. City of Portland, 33 F.3d 1200, 1205 (9th Cir. 1994).

Nonetheless, "local governments can exercise their substantial interest in regulating competing uses of traditional public fora by imposing permitting requirements for certain uses." Santa Monica Food Not Bombs v. Santa Monica, 450 F.3d 1022, 1038 (9th Cir. 2006). A local government may issue reasonable regulations governing the time, place, or manner of speech. Berger, 569 F.3d at 1036. "To be upheld as a constitutional time, place or manner restriction, a permit requirement applying to First Amendment [*16] activity in a public park must (1) be content neutral, (2) be narrowly tailored to serve a significant government interest, and (3) leave open ample alternative channels of expression." Grossman, 33 F.3d at 1205. "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." United States v. Playboy Entm't Grp., Inc., 529 U.S. 803, 804, 120 S. Ct. 1878, 146 L. Ed. 2d 865 (2000). See also Berger, 569 F.3d at 1048; Kuba v. 1-A Agr. Ass'n, 387 F.3d 850, 858-63 (9th Cir. 2004).

This court granted a preliminary injunction with respect to the permit and lottery system, finding that in light of the Ninth Circuit's decision in Berger v. City of Seattle, 569 F.3d 1029 (2009), "the permit requirement is likely to violate the First Amendment." (2010 Order at 26.) Berger concerned a permitting system employed by the 80-acre Seattle Civic Center which, among other things, required street performers to obtain permits before performing anywhere at the Center and to wear a badge while performing, and limited street performances to sixteen designated locations. Id. at 1035. The court in Berger rejected the argument that the permitting system promoted the government's interests [*17] in deterring wrongful conduct by threatening the loss of a permit and by identifying rulebreakers so as to notify them of alleged violations. Id. at 1044. The court held that such goals could be accomplished just as effectively by requiring a person observed violating the rules to identify herself and an after-the-fact penalty, such as the loss of the right to perform or a fine. Id. at 1043.

The Berger court did not strike down the sixteen designated performance locations, noting that "the delineation of performance areas, particularly in the most sought-after locales, might pass constitutional muster on a more developed factual record." Id. at 1045. The court held that the City submitted undisputed evidence that before the location restriction, there were weekly complaints from park tenant about street performers blocking entranceways and egresses, and the location rule did promote the City's interest in reducing these problems. Id. at 1049. It found an issue of fact as to whether the location restriction left "ample alternative channels for communication." Id.

The permitting and lottery system in this case differs in several respects from the system struck down in Berger. First, street [*18] performers may still perform anywhere else on the Boardwalk, although they are limited in terms of what items they can use (i.e., they cannot use pushcarts or tables elsewhere). Second, the lottery system assigns spaces to a particular person (or large performance group) for a particular day. However, after 12:00 p.m. each day any person, with or without a permit, may use an unoccupied P-Zone space and any person with an I-Zone permit may use an unoccupied I-Zone space, so long as she relinquishes the space should the lottery winner return. Third, insofar as an applicant seeks an I-Zone permit, she is required to disclose (1) her name and mailing address, (2) a description of the goods

Case 2:16-cv-01115-DDP-SS   Document 13-1   Filed 06/06/16   Page 20 of 88   Page ID #:73

Page 6
2013 U.S. Dist. LEXIS 111435, *18

or merchandise for which she seeks a permit, and (3) a declaration that the goods or merchandise are expressive items inextricably intertwined with the applicant's message.

This court determined that the permitting and lottery system was likely unconstitutional because "[t]here is no explanation as to why this system manages conflicting claims to limited space any more effectively than a simple first-come-first-served rule." (2010 Order at 26.) The court now considers whether the City has met its burden [*19] of showing that the permit system is narrowly tailored to promote its interest.

**1. Content-Neutrality**

"A regulation is content-based if either the underlying purpose of the regulation is to suppress particular ideas or, if the regulation, by its very terms, singles out particular content for differential treatment." Reed v. Town of Gilbert, AZ, 587 F.3d 966, 974 (9th Cir. 2009)(quoting Berger, 569 F.3d at 1051).

Plaintiffs argue that the Ordinance is content-based because in the P-Zone spaces, persons can perform, engage in traditional expressive speech, and petition, but can vend only certain expressive items: "newspapers, leaflets, pamphlets, bumper stickers, patches, buttons, or books created by the vendor or recordings of the vendor's own performances." LAMC § 42.15(2)(a). In the I-Zone spaces "persons may engage in activities permissible in the P-Zone, and also engage in vending of expressive items created by the vendor, or the vending of expressive items that are inextricably intertwined with the vendor's message." Id. § 41.15(2)(b). Plaintiffs argue that these require an officer to examine the content of the speech in order to determine whether it is permissible, because an officer [*20] must consider what matter qualifies as "newspaper," "leaflet" or "pamphlet"; whether an item has been "created, written or composed by the vendor"; whether an item is "inherently communicative"; whether an item has "nominal utility apart from its communication"; and other aspects of the speech. (Dowd Mot. at 13-14.)

Plaintiffs argue that such determinations are content-based by analogy to Forsyth County v. Nationalist Movement, 505 U.S. 123, 112 S. Ct. 2395, 120 L. Ed. 2d 101 (1992). There, the county of Forsyth, Georgia, passed an ordinance that allowed the county to adjust the fee for demonstration permit "in order to meet

the expense incident to the administration of the Ordinance and to the maintenance of public order in the matter licensed." Id. at 127. The Court determined that the ordinance was content based because "the fee assessed will depend on the administrator's measure of the amount of hostility likely to be created by the speech based on its content. Those wishing to express views unpopular with bottle throwers, for example, may have to pay more for their permit." Id. at 134.

Here, none of the characteristics an officer must consider is based in the subject matter of the message. Determining whether a piece [*21] of literature is a "pamphlet" or a t-shirt, for instance, involves a consideration of form rather than content; the message conveyed is immaterial. While an officer must discern whether an object is inherently communicative, the inquiry is only whether the object is inherently communicating any message, not whether the object is communicating a message on a specific topic. Unlike Foti v. City of Menlo Park, 146 F.3d 629, 633-34, where a city prohibited the posting of signs on public property with the exception of signs containing certain content (real estate open houses, safety and traffic notices, etc.), here the Ordinance does not target or privilege any particular message. Thus the Ordinance is not content based in the traditional sense of privileging or discriminating against certain topics. While it is by no means obvious whether certain objects are inherently communicative, even the close cases would depend not on the topic of the message but on the nature of the object.

The court finds that the 2008 Ordinance is not content based.

**2. Narrow Tailoring**

The City has met its burden in demonstrating that the 2008 Ordinance responds to a significant government interest. The 2008 Ordinance [*22] contains the following findings:

> The amount of space on the Boardwalk that is available for performing and visual artists and for political advocacy is limited due to the size of the Boardwalk and the large crowds of visitors that the Boardwalk attracts. Due to the limited amount of space, unregulated vending along the Boardwalk prevents many

persons from engaging in performance, art, advocacy or other expressive activities. Prior to the City's Board of Recreation and Parks Commission establishing a program for assignment of spaces, unregulated vending resulted in conflicting claims for the available space. There were numerous altercations over the locations and amounts of space that any one person or organization could use. Frequently, the altercations became violent, requiring law enforcement response to preserve the public peace. Persons wishing to secure spaces often arrived prior to dawn and created loud noises in setting up their displays, thereby disturbing the public peace and requiring a law enforcement response. Unregulated, the Boardwalk became a place where only the strongest and earliest arrivals could secure space to exercise their rights of free expression without threat [*23] of intimidation. It is, therefore, necessary to regulate the use of the limited space on the Boardwalk to prevent conflicting claims for the space and to allocate the limited space available fairly to all who desire to use it for lawful purposes.

LAMC (2008) § 42.15(A)(1)(b)(ii). The court accepts these findings as evidence of a significant government interest. "As a general matter, courts should not be in the business of second-guessing fact-bound empirical assessments of city planners." City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 451, 122 S. Ct. 1728, 152 L. Ed. 2d 670 (2002)(J. Kennedy concurring). See also Alameda Books, Inc. v. City of Los Angeles, 631 F.3d 1031, 1042-43 (9th Cir. 2011). Plaintiffs have presented no evidence creating an issue of fact in this respect.

The City must also present evidence that the Ordinance was narrowly tailored to advance this interest. On its face, the Ordinance was crafted to remedy the problems identified in the findings. Unlike the ordinance in Berger, the 2008 Ordinance was a space allocation system which assigned performers to particular spots to effectively distribute the limited space of the Boardwalk. The permits combined with the lottery system provided a mechanism [*24] for officers to resolve disputes about

space allocation in a neutral manner. The lottery system was also designed to discourage pre-dawn arrival at the Boardwalk in order to secure a space, and to expand the pool of potential performers to include speakers who might not assert themselves in a first-come-first-serve situation. The ordinance thus appears to be carefully crafted to resolve the problems identified in the findings. "[T]he regulation responds precisely to the substantive problems which legitimately concern the Government." Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 297, 104 S. Ct. 3065, 82 L. Ed. 2d 221 (1984)(internal citations and quotation marks omitted).

The City presents some evidence that the permit system managed space more effectively than the first-come-first-serve system. The City cites a declaration from Victor Jauregui, Senior Recreation Director II within the City of Los Angeles Department of Recreation and Parks, stating that "[t]he space allocation system with the lottery eliminated many of the prior disturbances and problems over spaces. It also allowed those who could not arrive at the crack of dawn or who were not the most aggressive to have a chance to be assigned a space at [*25] the Boardwalk." (Jauregui Decl. ¶ 8.) Jauregui also stated that with space assignment through the permit and lottery, "City staff had a neutral way to determine who was entitled to the space by looking at the lottery results." (Id. ¶ 9.)

Plaintiffs present evidence that a performer who did not obtain a permit through the lottery would not have a permit for a seven days or had to wait until 12:00 p.m. to obtain a space. (Dowd Decl. ¶ 10.) Performers did not always obtain spots. (See e.g. LaGrossa Decl. ¶ 10, stating that he obtained spots 60% of the time.) Plaintiff Demian asserts that his income was reduced because he could not use his amplifier in all spots and did not always get a spot where amplification was permitted. (Demian Decl. ¶ 33.)

Plaintiffs also present declarations to the effect that the Ordinance increased tensions among them. See e.g. Demian Decl. ¶ 14 ("Because of us being cramped together like that [in the large performance spaces], there would be a lot of anger sometimes"), LaGrossa Decl. ¶ 9 ("[T]hey put us like crabs in a barrel, and so naturally there's going to be fights."), Brown Decl. ¶ 11, noting that there were still disputes with the permit system, but now [*26] they are between "people trying to get spaces to sell things."). [1]

1   The City objects to these statements as opinion rather than fact and therefore inappropriate for declarations. (City's Objections to Plaintiffs' Declarations.) See Fed. R. Civ. P. 56(c) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.") and L.R. 7-7 ("Declarations shall contain only factual, evidentiary matter and shall conform as far as possible to the requirements of F.R.Civ.P. 56(c)(4).") The court finds that the declarations are based on the performers' first-hand knowledge of the interactions among performers on the Boardwalk and is therefore admissible.

Plaintiffs' evidence shows that there was some tension on the Boardwalk among performers, but this does not create an issue of fact as to whether altercations decreased; as the City points out, there could be fewer altercations and noise disturbances alongside some tensions and altercations among performers. In addition, the City is not required to achieve its substantial interest [*27] with the least speech-restrictive alternative. Clark, 468 U.S. at 299. Plaintiffs' evidence is not persuasive in demonstrating that the Ordinance was speech restrictive; it shows instead that Plaintiffs had objections to certain aspects of the Ordinance. That does not necessarily amount to a restriction on speech.

### 3. Alternative Channels of Expression

As the court pointed out in its 2010 Order, another important difference between this Ordinance and the one in Berger is that in Berger, the park required a permit for performers who wished to perform anywhere in the park. Here, the permit is required only for those performers who wish to set up their equipment and remain in a one-mile stretch of the Boardwalk. Performers are free to express themselves without using a table or other equipment within that one-mile area. They may occupy spaces that are not occupied after noon each day, provided they relinquish the space if the person to whom it was assigned appears. Additionally, they may set themselves up on the Boardwalk outside that one-mile area without obtaining a permit. 2

2   In itself, the fact that performers could set up tables for speech outside the one-mile area would not provide [*28] a sufficient alternative channel

of communication. Although one mile is a limited slice of the Boardwalk, it is nonetheless a significant area, especially for a person who wished to express a message to as broad an audience as possible.

The Ordinance thus provides alternative channels of expression.

### 4. Vagueness challenge

The court previously found that Plaintiffs do not have standing to challenge the vending ban as void for vagueness because of its exception for expressive items that are 'inextricably intertwined' with the speaker's message. (2010 Order at 11.) The court found that "Plaintiffs engage in activities that do not fall within the ambit of the anti-vending regulations, as they are street performers who engage in traditional expressive speech, vend expressive items they have created, and sell recordings of their own performances. In fact, none of the Plaintiffs claims to have been chilled from performing or vending any items based on the anti-vending regulations." (2010 Order at 11-12.) The court therefore dismissed Plaintiffs' facial void-for-vagueness challenge to the vending ban and its exception for expressive items "inextricably intertwined" with the speaker's message. [*29] Id. at 13. The court nonetheless indicated that "insofar as the Plaintiffs argue that the permitting scheme grants unbridled discretion to licensing officials because of its incorporation of the 'inextricably intertwined' standard, that claim survives the City's motion to dismiss." (Id. at 13 n.2.)

Plaintiffs assert that "[o]n the more fully developed record, Plaintiffs have standing to challenge the vending ban as void for vagueness. Plaintiffs engage in activities that fall within the ambit of the anti-vending regulations despite the fact that they are also street performers who engage in traditional expressive speech. Plaintiffs do claim to have been chilled from performing or vending any items based on the police harassment and enforcement of the anti-vending regulations." (Dowd Mot. at 24.) They also assert that they are challenging the vagueness of other terms in § 42.15, including "inherently communicative," "nominal utility apart from its communication," "some expressive purpose," and "dominant" non-expressive purpose. (Id.)

Despite these assertions, Plaintiffs fail to distinguish these claims from the claims dismissed by this court in

the 2010 Order or to point to those portions [*30] of the "more fully developed record" that purportedly give them standing to challenge the vending ban despite the previous dismissal of this claim. Noting that "Plaintiffs' Declarations amply demonstrate a 'serious interest in subjecting themselves to' the challenged measure, and that the City is 'seriously intent on enforcing the challenged measure' against them" without pointing to factual evidence in the record is insufficient to establish a genuine issue of material fact. (Dowd Reply at 4.) Nor is it sufficient for Plaintiffs to state that "[g]iven the limitations of space, all of those facts [in the Statement of Uncontroverted Facts and Conclusions of Law] cannot be repeated here and the Court is encouraged to review the Declarations and the Statement in detail." (Dowd Mot. at 2.) It is not the court's task "to scour the search in search of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275, 1278 (9th Cir. 1996). Counsel has an obligation to lay out the support clearly. Carmen v. San Francisco Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001). The court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set [*31] forth in the opposition papers with adequate references so that it could conveniently be found." Id.

The court finds that Plaintiffs' vagueness challenge was previously dismissed and that Plaintiffs have failed to present evidence sufficient to cause the court to take up the issue again.

## C. Amplified Sound Ban

The use of a sound amplification device is protected by the First Amendment. Saia v. New York, 334 U.S. 558, 561, 68 S. Ct. 1148, 92 L. Ed. 1574 (1948). As discussed above, "the City has the burden of justifying the restriction on speech." Klein v. City of San Clemente, 584 F.3d 1196, 1201 (9th Cir. 2009). In order for a regulation of amplified sound to comport with the First Amendment, it must (1) be "'justified without reference to the content of the regulated speech,'" (2) be "'narrowly tailored to serve a significant government interest,'" and (3) "'leave open ample alternative channels for communication of the information.'" Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989) (quoting Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293, 104 S. Ct. 3065, 82 L. Ed. 2d 221 (1984)).

LAMC § 42.15(F)(4) and the Program Rules ban the use of amplified sound anywhere on the Boardwalk except in specially designated P-Zone spaces between 17th [*32] Avenue and Horizon Avenue and between Breeze Avenue and Park Avenue. (2008 Ordinance, §§ 42.15(D)(2)(c) and (F).) Fifty-six out of the 105 P-Zone spaces were in the area in which amplified sound was permitted. The ordinance also allowed the City to issue special events permits for amplified sound. (2008 Ordinance, § 42.15(F)(6).)

The City now asserts that the amplified sound ban is intended not only to protect residential areas from excess noise, but also to balance the expressive needs of various Boardwalk users. (2008 Ord. 42.15(A)(1)(b). It points out that there are other noise regulations applicable to the Boardwalk as a whole and that the 2008 Ordinance addressed the use of amplified sound as "one of numerous issues involving vendors and performances" on the western side of the Boardwalk. (City Reply at 21.)

The court finds that although the city has an interest in balancing the expressive needs of various Boardwalk users and in regulating the noise levels on the Boardwalk, this ordinance is not narrowly tailored because it targets only one aspect of the problem, namely, the sound emanating from the west side of the Boardwalk. It does not address sound emanating from the east side [*33] or from visitors.

The amplified sound ban thus places the burden of achieving the government's purpose upon one group. "[A]lthough the chosen restriction need not be the least restrictive or least intrusive means available to achieve the government's legitimate interests, the existence of obvious, less burdensome alternatives is a relevant consideration in determining whether the 'fit' between ends and means is reasonable." Berger v. City of Seattle, 569 F.3d at 1041. Performers in the eight most northern blocks of the Boardwalk are banned from using any amplification. This ban intrudes on those performers' attempts to make themselves heard. See e.g. Demian Decl. ¶ 9 (stating that the amplified sound ban made it too difficult to perform acoustically because it is impossible to "project" enough to be heard). The obvious less restrictive alternative to the absolute amplified sound ban is a decibel limit that would apply to all users of the Boardwalk, on both sides. The Boardwalk already has a decibel limit of 75bDA at 25 feet and 96 dBA at one foot. LAMC § 42.15(F). If the overall sound level is the problem the Ordinance is meant to address, the obvious

less restrictive alternative is [*34] for the City to decrease the maximum decibel limit on both sides of the Boardwalk, rather than barring all amplification by performers on the west side.

The court finds that the amplified sound ban is not narrowly tailored and therefore facially unconstitutional. The court GRANTS summary judgment in favor of Plaintiffs on this issue.

### 3. Height Limitation

The 2008 Ordinance includes a height restriction: "No person shall place or allow any item (except an umbrella or other sun shade) exceeding four feet above ground in any designated space . . . ." (Section 42.15 (2008) G(2)(b). See also Program Rules, Public Expression Program Regulations, p.6.) Although regulating equipment, this section of the Ordinance arguably constrains communicative conduct and therefore is subject to a challenge under the First Amendment. Vlasak v. Superior Court of California ex rel. County of Los Angeles, 329 F.3d 683, 687 (9th Cir. 2003). Again, the City bears the burden of demonstrating that the Ordinance "advances a substantial governmental interest and that it is narrowly tailored to prevent no more than the exact source of the 'evil' it seeks to remedy." Edwards v. City of Coeur d'Alene, 262 F.3d 856, 863 (9th Cir. 2001)(quoting [*35] Frisby v. Schultz, 487 U.S. 474, 485, 108 S. Ct. 2495, 101 L. Ed. 2d 420 (1988)).

The 2008 Ordinance includes the following findings:

(iv) The vendors and their equipment may impede the ingress and egress of emergency and public safety vehicles by creating physical obstacles to emergency response and administration of aid to those in need of immediate medical attention and to victims of criminal activity. It is therefore necessary to regulate vendors and their use of equipment to avoid interference with emergency response vehicles that provide assistance to individuals with medical needs and victims of criminal activity.

...

(vi) Unregulated vending causes visual clutter/blight along the Boardwalk,

impedes the views of the beach and the Pacific Ocean, and threatens the City's ability to attract tourists and preserve businesses along the Boardwalk. It is therefore necessary to regulate the number of vendors, the size of their equipment, and displays, and the location of vending activity.

Sec. 42.15 A.1.(b).

As discussed above, the City has the burden to demonstrate that the Ordinance is narrowly tailored to promote a significant interest. The City presents evidence that it has a substantial interest, as stated in the Ordinance's [*36] findings, in facilitating emergency access and reducing visual clutter. See Honolulu Weekly, Inc. v. Harris, 298 F.3d 1037, 1045 (9th Cir. 2002) ("both the Supreme Court and this Court have found that aesthetics can be a substantial governmental interest."); Members of City Council of City of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 805, 104 S. Ct. 2118, 80 L. Ed. 2d 772 (1984)("It is well settled that the state may legitimately exercise its police powers to advance esthetic values.").

Plaintiffs argue that the height restriction is not narrowly tailored to achieve those interests because it imposes a significant burden on performers, who often use microphone stands, musical instruments, and other props such as ladders, which are higher than four feet. They also argue that it is irrational insofar as it makes an exception for umbrellas.

In Vlasak, cited by the City, the Ninth Circuit upheld Los Angeles Municipal Code section § 55.07, which prohibits the "carrying or possession of certain 'demonstration equipment'-rectangular wooden pieces more than 1/4 inch thick and 2 inches wide, or non-rectangular pieces thicker than 3/4 inch." Vlasak, 329 F.3d at 686. The court found that, unlike a broad ban on all signs [*37] attached to wooden or plastic handles, this ordinance was "narrowly tailored to meet the substantial interest in public safety," that "[t]he dimension restrictions . . . are not substantially broader than necessary to achieve the government interest," and that the ordinance did not "deprive[] demonstrators of alternative means of communication." Id. at 690. The court found that the ordinance was narrowly tailored because it advanced the public safety interest by limiting

the size of handles that could be used as weapons while still allowing demonstrators to communicate their message in the form they chose (placards).

Here, the City does not explain why a four feet restriction, as opposed to a three feet or a six feet restriction, advances its interest. Nonetheless, "particularly where conduct and not merely speech is involved, . . . the over-breadth of a statute must not only be real, but substantial as well, judged in relation to its plainly legitimate sweep." Broadrick v. Oklahoma, 413 U.S. 601, 615, 93 S. Ct. 2908, 37 L. Ed. 2d 830 (1973). Here, the regulation, while limiting some speech, is not substantially overbroad; Plaintiffs have some limitations on their performances - they cannot use microphones of a certain [*38] height, and performers accustomed to performing from ladders are unable to do so - but the limitations leave ample channels of communication while advancing the City's interests. The limitations placed on Plaintiffs' performances are not so substantial as to lead the court to micromanage the City's regulation of public safety and aesthetics.

The court GRANTS summary judgment in favor of Defendants on this issue.

**4. Rotation Requirement**

The 2008 Ordinance allocates 5 of the 105 spaces in the P-Zone to large act/performance groups that draw an audience of 25 or more persons on average. (2008 Program Rules at 2.) The Program Rules state:

> the space(s) may be rotated once every hour beginning at 11:00 a.m., if more than one performer or group wants the same space. Example: if two group/performers want space D, they would alternate performances on an hourly basis beginning at 11:00 a.m.

Id. at 6.

The 2008 Ordinance includes findings, discussed above, that the Boardwalk is a limited space, and that altercations took place to obtain available space. LAMC Section 42.15 (1)(b)(ii). To accommodate groups that would attract large numbers of people, the Ordinance set aside a certain number of spaces [*39] into which performers could rotate. Plaintiffs point to a litany of problems [3] with the rotation requirement, including the

fact that there is no cap on the number of performers who can be in the rotation; the ordinance privileges "popular" speech attracting 30 or more people over less popular speech; performers must predict how large their audience will be; police have too much discretion to determine whether the act attracted a large enough audience; and it is vague, leading to arbitrary enforcement by the police.

> 3   Plaintiffs do not cite to any evidence in their papers. Once again, it is not the court's task "to scour the record in search of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996).

The court finds that Plaintiffs have not created an issue of fact as to the narrow tailoring of the rotation requirement. As discussed with respect to the height requirement, the court finds that the rotation requirement does not burden substantially more speech than necessary.

The court GRANTS summary judgment to Defendants on this issue.

**5. Sunset Requirement**

The Program Rules restrict all activity in designated spaces to the period between 9 a.m. and sunset. [*40] (2008 Program Rules at 6.) The City has presented evidence that the purpose of the requirement is to "ensure [the Boardwalk] is clean and safe for the crowds of people that will visit the following day." (Decl. Jauregui ¶ 10.) Plaintiffs allege that this is not a reasonable time, place, and manner restriction because sunset times change each day, the marine layer prevents visual observation of the sunset, tourists leave the park after - but not before - sunset, and other parks close one hour after sunset. (FAC ¶ 43.) Plaintiffs assert that it would be more reasonable for the park to close one hour after sunset. (Id.) It is not clear how these allegations, unsupported by evidence, amount to evidence that the requirement burdens more significantly speech than necessary and is not narrowly tailored. [4] The court finds that there is no issue of fact and GRANTS summary judgment in favor of the City.

> 4   Again, Plaintiffs do not refer in their papers to any evidence on this point in their moving papers or opposition. It appears that the evidence they have on this point is presented in response to the City's Uncontroverted Fact number 19, which

states the purpose of this section of the Ordinance [*41] as being to make the Boardwalk clean and safe for the following day and to reduce noise in the adjacent residential neighborhoods. Plaintiffs present over four pages of purported evidence, but it is non-responsive, as it deals primarily with the continuing presence of conflicts among performers.

**D. Rules of Decorum**

Plaintiffs seek a declaratory judgment that certain of the Los Angeles City Council Rules of Decorum violate the First Amendment and Article 1 § 2 of the California Constitution. (Compl., Prayer for Relief, ¶¶ 2,3.) They also seek a declaratory judgment that "the challenged sections of the Council Rules are 'unconstitutional as-applied,' as well as an order expunging all violations and citations of those rules "in any and all files maintained by the City." (Id., Prayer for Relief, ¶¶ 4, 5.) They also seek a preliminary injunction against the Rules of Decorum. (Id., Prayer for Relief, ¶ 1.)

**1. Facial Challenge**

Under Ninth Circuit law, city council meetings, "once opened, have been regarded as public forums, albeit limited ones." White v. City of Norwalk, 900 F.2d 1421, 1425 (9th Cir. 1990). "A council can regulate not only the time, place, and manner of speech in a limited public [*42] forum, but also the content of speech -- as long as content-based regulations are viewpoint neutral and enforced that way." Norse v. City of Santa Cruz, 629 F.3d 966, 975 (9th Cir. 2010). However, rules of decorum are constitutional if they "only permit[] a presiding officer to eject an attendee for actually disturbing or impeding a meeting." Acosta v. City of Costa Mesa, 718 F.3d 800, 811 (2013)(quoting Norse, 629 F.3d at 976).

In Norwalk, the Ninth Circuit considered a facial challenge to council rules nearly identical to those at issue in this case. The relevant portion of the rule was the following:

> Each person who addresses the Council shall not make personal, impertinent, slanderous or profane remarks to any member of the Council, staff or general public. Any person who makes such remarks, or who utters loud, threatening, personal or abusive language, or engages

in any other disorderly conduct which disrupts, disturbs or otherwise impedes the orderly conduct of any Council meeting shall, at the discretion of the presiding officer or a majority of the Council, be barred from further audience before the Council during that meeting.

Norwalk, 900 F.2d at 1424. The Ninth Circuit did not [*43] consider the constitutionality of the rule on its face and held that because the rule was "readily susceptible" to be interpreted as requiring "that removal can only be ordered when someone making a proscribed remark is acting in a way that actually disturbs or impedes the meeting," it did not violate the First Amendment. Id.

Here, the Rule in question is similar to the rule in Norwalk: [5]

> Persons addressing the Council shall not make personal, impertinent, unduly repetitive, slanderous or profane remarks to the Council, any member of the Council, staff or general public, nor utter loud, threatening, personal or abusive language, nor engage in any other disorderly conduct that disrupts, disturbs or otherwise impedes the orderly conduct of any Council meeting.

(FAC ¶ 64; City Mot. Exh. 306, Rules of the Los Angeles City Council As Amended (July 2009), Ch. 1 Rule No. 12(a).)

> [5]   The two are distinguishable in that the Norwalk rule uses "which" where the L.A. rule uses "that," a point which could be significant if a strict grammatical interpretation were performed. See notes 2 and 3 below.

There are at least three possible interpretations of the Rule. First, reading the sentence as three disjunctive [*44] clauses separated by "nor," it could be taken to state that certain kinds of speech are not allowed (personal, impertinent, repetitive, slanderous, threatening, etc.) and additionally that "disorderly conduct" that is disruptive is not allowed. Read this way, there is no "actual disruption" required for there to be a breach of the rule. A second interpretation is that the final clause ("that disrupts, disturbs or otherwise impedes the orderly

conduct of any Council meeting") could be taken to modify all three sets of speech and behavior, [6] thus imposing an "actual disturbance" requirement on all types of speech and conduct listed. Third, the final clause -"nor engage in any other disorderly conduct that disrupts, disturbs or otherwise impedes the orderly conduct of any Council meeting" -could be taken to indicate that the first two types of speech or conduct (profanities, slander, abusive language, etc.) are a type of conduct that inherently "disrupts, disturbs, or otherwise impedes the meeting," and that other, similarly disruptive conduct is also prohibited. [7]

> 6   This is an ungrammatical reading of the Rule. "That" introduces "a clause defining or restricting the antecedent, and thus [*45] completing its sense." Oxford English Dictionary online, "that, pron.2." Sept. 2012. Oxford Univ. Press. <http://www.oed.com/view/Entry/200178?rs key=U6kljt&result=3&isAdvan ced=false>. (Nov. 29, 2012.) Here, as a grammatical matter it is clear that "that" is restricting the meaning of "disorderly conduct," not of the clauses preceding the sentence's final "nor." Nonetheless, given the widespread confusion concerning the use of "that" and "which," the court will not base a determination of whether the rule is "readily susceptible" to a certain interpretation on that interpretation's grammatical precision.

> 7   As discussed below, the video evidence suggests that City Council members interpret the rule in this way.

Only the second construction, which imposes an actual disruption requirement on all prohibited speech, allows the Rule to survive constitutional scrutiny because is otherwise viewpoint discrimination. As Plaintiffs point out, by their nature, "personal, impertinent and slanderous remarks will be critical. No one could be deemed impertinent while praising the City Council." (Plaintiff's Mot. at 32.) "The council members should [know] that the government may never suppress viewpoints [*46] it doesn't like." Norse, 629 F.3d at 979 (Kozinski, J. concurring). Nonetheless, because the Ninth Circuit interpreted a similar statute and found that it resisted a facial challenge, the court here likewise holds that the Rule is constitutional insofar as it is interpreted by the Council as requiring an "actual disruption" separate from the bare violation of the Rule.

The court notes, however, that this is an uncomfortable result. Without the "actual disruption" requirement, the Rule would be unconstitutional viewpoint discrimination. Acosta, 718 F.3d at 812 (holding that a city council rule of decorum prohibiting "any personal, impertinent, profane, insolent, or slanderous remarks" without requiring an actual disruption is unconstitutional). With the "actual disruption" requirement, any speech covered by the first two parts of the rule would also qualify under the broader (and more likely constitutional) final category of "disorderly conduct that disrupts, disturbs or otherwise impedes the orderly conduct of any Council meeting." The restrictions on personal, impertinent, and slanderous remarks therefore serve no purpose in the Rule; they are remnants of unconstitutional restrictions [*47] saved from invalidity only by the qualification of "actual disruption" that arguably applies to them. Those restrictions on speech are thus at best superfluous. At worst, they chill constitutionally protected political speech. The rule contains a list of prohibited (and unconstitutionally restrictive) types of speech that is then, much less explicitly, qualified by the actual disruption requirement and thereby rendered constitutional. Although the Rule may help the Council meetings run more smoothly, it verges on violating the core right of citizens to criticize their democratically elected officials. And, as discussed below, because of its phrasing, it is easy to apply the Rule in an unconstitutional manner.

Nonetheless, Ninth Circuit precedent compels upholding the Rule insofar as it is interpreted to include an "actual disruption" requirement. [8] For the reasons discussed above, this requirement must be applied scrupulously in order to avoid violating the First Amendment.

> 8   This said, the City would do well to consider revising the Rules of Decorum to make it clear that an actual disruption is required before a speaker can be ejected. As discussed below, the court finds, based on the [*48] video evidence, that the Rules of Decorum are unconstitutional as applied. Revising the Rules of Decorum to indicate that an actual disruption is required would provide clear guidance to the City Council to help it conduct its business within the bounds of the First Amendment.

**2. As-applied Challenge**

2013 U.S. Dist. LEXIS 111435, *48

"Norwalk permits the City to eject anyone for violation of the City's rules--rules that were only held to be facially valid to the extent that they require a person actually to disturb a meeting before being ejected." Norse v. City of Santa Cruz, 629 F.3d at 976. The court now considers whether Plaintiffs Dowd and Saltsburg actually disturbed the City Council meeting prior to being ejected.

### a. Actual Disruption Standard

The Ninth Circuit has not defined "actual disruption" with precision. Actual disruption need not resemble a breach of the peace or fighting words. Norwalk, 900 F.2d at 1425. "A speaker may disrupt a Council meeting by speaking too long, by being unduly repetitious, or by extended discussion of irrelevancices. The meeting is disrupted because the Council is prevented from accomplishing its business in a reasonably efficient manner." Id. at 1426.

Although the standard for disruption [*49] is relatively low, a disruption must in fact have occurred. "Actual disruption means actual disruption. It does not mean constructive disruption, technical disruption, virtual disruption, nunc pro tunc disruption, or imaginary disruption. The City cannot define disruption so as to include non-disruption to invoke the aid of Norwalk." Norse, 629 F.3d at 976 (9th Cir. 2010). "The Supreme Court long ago explained that 'in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression.'" Id. at 979 (Kozinski, J. concurring.), quoting Tinker v. De Moines Ind. Cmty. Sch. Dist., 393 U.S. 503, 508, 89 S. Ct. 733, 21 L. Ed. 2d 731 (1969).

In some cases, the line between actual and potential disruption is difficult to draw. In Kindt v. Santa Monica Rent Control Bd., 67 F.3d 266 (9th Cir. 1995), the Ninth Circuit held that it was permissible to remove a man who had previously disrupted proceedings of the same meeting when his "cohort" and frequent partner in disruption made an obscene gesture "which threatened to start the disruption all over again." Id. at 271. However, in Norse, the Ninth Circuit held that there had not clearly been a disruption when a man "gave [*50] the Council a silent Nazi salute" and was then ejected and arrested, rejecting the City's definition of "disturbance" as "any violation of its decorum rules." Norse, 629 F.3d at 976.

At a minimum, the disturbance must be something more than the bare violation of a rule. In Acosta, the

Ninth Circuit favorably considered two jury instructions indicating that actual disruption is measured by an effect on the audience and that profanity without more is not an actual disruption. 718 F.3d at 810 n.5 ("Whether a given instance of alleged misconduct substantially impairs the effective conduct of a meeting depends on the actual impact of that conduct on the course of the meeting." . . . "A speaker may not be removed from a meeting solely because of the use of profanity unless the use of profanity actually disturbs or impedes the meeting.").

The power to determine when a disruption has occurred has been placed in the hands of the moderator. Norwalk, 900 F.2d at 1426 ("The role of a moderator involves a great deal of discretion. Undoubtedly, abuses can occur, as when a moderator rules speech out of order simply because he disagrees with it, or because it employs words he does not like.") The disruption [*51] cannot be the reaction of a Councilmember who is attacked. Norse, 629 F.3d at 979 (CJ. Kozinski concurring) ("Though defendants point to Norse's reaction to Councilman Fitzmaurice as the 'disruption' that warranted carting him off to jail, Norse's calm assertion of his constitutional rights was not the least bit disruptive. The First Amendment would be meaningless if Councilman Fitzmaurice's petty pique justified Norse's arrest and removal.")

### b. As-applied Challenge

The Ninth Circuit has identified two types of as-applied challenges. The first "paradigmatic type" is "one that tests a statute's constitutionality in one particular fact situation while refusing to adjudicate the constitutionality of the law in other fact situations." Hoye v. City of Oakland, 653 F.3d 835, 854 (9th Cir. 2011)(citation and internal quotation marks omitted). The second type is "based on the idea that the law itself is neutral and constitutional in all fact situations, but that it has been enforced selectively in a viewpoint discriminatory way. Such a challenge . . . is dependent on the factual evidence provided as to how the statutory scheme has in fact operated vis-à-vis the plaintiffs." Id. (citation and [*52] internal quotation marks omitted).

Plaintiffs have not presented evidence of the second type of as-applied challenge. Deposition evidence of Council members or other types of policy evidence would be required for the court to extrapolate from the video, transcript, and declaration evidence and find that there is a policy, rather than isolated instances, of

2013 U.S. Dist. LEXIS 111435, *52

unconstitutional application.

The court therefore considers the specific instances in which Plaintiffs contend that the Rules of Decorum were unconstitutional as applied. [9]

> 9   The court requested supplemental briefing identifying these incidents.

### c. Incidents

The first three incidents took place on March 4, 2008, August 13, 2008, and June 12, 2009, prior to the amendment of the Rules on July 29, 2009. (FAC ¶ 64.) Plaintiffs assert that their challenge applies to the Rules prior to their amendment and to the amended Rules. The FAC is ambiguous on this point. However, nowhere in their briefing do Plaintiffs present the pre-2009 Rules, which may or may not contain the same provisions Plaintiffs are challenging. The court therefore declines to consider the first three incidents.

Plaintiffs have identified approximately ten [10] additional incidents [*53] involving Plaintiffs David Saltsburg ("Zuma Dogg" or "Dogg") and Matt Dowd when they attended City Council meetings. (Joint Statements RE Incidents 4 - 13.) The court has reviewed the video recordings and transcripts of the incidents provided by the parties. The evidence often demonstrates significant tolerance of citizen speech on the part of the members of the City Council. Dowd and Dogg were frequent speakers at City Council meetings and were ejected from only a handful of them. However, the court finds that each identified incident involves an unconstitutional application of the Rules of Decorum. The fact that these incidents represented a fraction of Dowd and Dogg's appearances at City Council meetings does not mitigate the constitutional violations. Additionally, although the court does not have enough evidence to determine that the City has a policy of applying the Rules in an unconstitutional fashion, it appears from the video evidence that the City Council and the representative of the City Attorney do not always require a disruption beyond the breach of the Rules of Decorum. Additionally, they appear to interpret the use of profanity as an actual disruption per se.

> 10   Incidents [*54] 8 and 9 appear to be substantially overlapping.

For instance, in Incident No. 4, on Sept. 2, 2009,

Plaintiff Dowd addresses the City Council and says "First of all, your president is pathetic and hopeless and is not doing a very good job and you need to get together and lose her because, because see when Eric is not here - sit down [Councilman] LaBonge, just sit down." (Joint Statement RE Incident No. 4 at 1.) Council members then discuss the incident with City Attorney Dion O'Connell who advises them as follows: "The speaker should not engage in personal attacks on the councilmembers. He can speak about the performance of the City services and the councilmembers but not engage in personal attacks." (Id.) Dowd begins speaking again.

> DOWD: See when it's just me it's I, Matthew Dowd and when I'm talking to you that's the part that's not allowed but when I'm talking about you that's the third person and you did it to me yesterday so I'm filing on the decorum. I got to sue for the 42.15 you are still using the words inextricably intertwined but there's no guidelines for what that fucking means. I am tired. . . .
> PERRY: Thank you very much, that is the end of your time now. [11]
> LABONGE: He [*55] should be removed.
> PERRY: Okay, thank you.
> LABONGE: He should be removed from the meeting.
> PERRY: Mr. Officer if you can please escort Mr. Dowd to the door. Thank you very much.
> . . .
> O'CONNELL: It is within the Council's discretion to ban him from attending, or from speaking, he can attend the meetings but he can't speak for a certain amount of time. In the past it has been 3 days, then since the new Council rules, Council can ban him for up to 30 days.
> PERRY: Would someone like to make a motion.
> ZINE: I make a motion for 30 days.

The council then voted 11 to 1 to ban him for 30 days.

> 11   The video appears to indicate that Dowd had 15 seconds remaining on his clock.

2013 U.S. Dist. LEXIS 111435, *55

The City argues that "Dowd's actions disrupted the meeting by shifting the focus to the speaker's improper language and conduct rather than the issues and business before the Council. His personal attacks directed toward individual Councilmembers did not further the governmental process or enlighten either the Council or the public regarding items of City business, they simply delayed the City Council meeting and impeded the City Council's ability to efficiently complete its business." (Defendant's Position on Incident No. 4 at 1.) [*56] The court disagrees. Calling the Council president "pathetic and hopeless" and saying she is "not doing a very good job and you need to get together and lose her" is political speech at the heart of the First Amendment. As Councilwoman Perry says during the incident, "Whether I like what he has to say or not, which I actually don't like, . . . he still has the right to say it." (Joint Statement RE Incident No. 4 at 2.) While the frustration of Councilmembers is understandable, so is the frustration of Dowd at experiencing an interruption that "broke[] [his] whole thread." (Id.)

The City does not point to, nor does the court discern in the video, any disruption beyond Dowd's speech. It appears based on this video, taken with the other incidents, that it was Dowd's use of a profanity ("there's no guidelines for what that fucking means") that was the basis for dismissing him from the meeting and for the weighty punishment of barring him from speaking for 30 days. [12] But '[a] speaker may not be removed from a meeting solely because of the use of profanity unless the use of profanity actually disturbs or impedes the meeting." Acosta, 718 F.3d at 810 n.5. The court finds that no actual disturbance [*57] took place here. This is also the case in Incidents 5, 7, 8, 9, 10, 11, 12, and 13. In all of those instances, the court finds that there is no actual disturbance beyond breaching the Rules by the use of profanity.

> [12]   Taken together, the evidence strongly suggests that the City Council believed that profanity was a sufficient basis on which to eject a speaker. For instance, in Incident No. 11, February 14, 2012, Dogg is allowed without interruption to sing a rendition of a Whitney Houston song to express his love for Councilmember Parks, but is ejected when he says, "As Matt Dowd would say that is fucked up." (Joint Statement RE Incident No. 12 at 2.) The song is not considered a disruption, but the profanity is.

If profanity takes a speaker off topic, it could be grounds to silence the speaker because it would impede the progress of the meeting. However, the profanity in the video evidence of these incidents is in the service of making a point that is related to the issue at hand, if not taking the discussion in the direction that the Council intends. For instance, in Incident No. 12, February 14, 2012, Zuma Dogg used a profanity as an intensifier in the context of a critique of the [*58] City Attorney. (Joint Statement RE Incident No. 12 at 2 ("[T]hen we'll see what the jury has to say so Carmen Trutanich can spend millions and millions and millions and millions of dollars [and] outside counsel can drag it out and I only want a fraction. As Matt Dowd would say that is fucked up.").)

Additionally, even where profanities are not involved, in some instances, the City's determination that certain comments are not on topic results in a limitation of political speech. For instance, in Incident No. 6 from October 15, 2010, Dowd was again removed from a meeting, this time because he was not on topic. The subject was the funding of the Pacoima Christmas Parade. Pacoima is in City Council District 7, of which Richard Alarcon was the representative. Before Dowd began to comment, Dogg stated, "My public comment is that I want council to discuss the legality of this when you've got a criminal taking the money." Dowd then came to the podium. Dowd and Councilman Zine had an interchange about the relevance of Dogg's and Dowd's comments to the agenda item:

> ZINE: The subject matter is the Christmas Parade. That's the debate right now.
> DOWD: Okay, and I'm talking about Richard Alarcon's [*59] performance in his council district. What's wrong with that?
> ZINE: That is not the issue. That is not the issue.
> DOWD: It's in his district and he's getting money out of the general fund . . .
> ZINE: The issue is the Christmas Parade in Pacoima . . .
> DOWD: Get the City Attorney, please, get your head on the hook . . .
> ZINE: The Christmas Parade is the subject . . .

29

DOWD: Exactly, and I'm against it because Richard Alarcon shouldn't be a councilman right here and if he stays you're going to have to put up with it . . .

ZINE: Mr. Dowd, Mr. Dowd, you're finished for the day

DOWD: . . . public comment

ZINE: Mr. Dowd, you're finished for the day. You're finished for the day, Mr. Dowd. Sergeant at Arms, remove him from chambers. He's finished for the day.

(Joint Statement RE Incident No. 6 at 10.) The court finds the discussion of a councilman's alleged criminal activities is relevant to a discussion of funding that the City intends to give to that councilman's District. Indeed, this incident is exemplary of why it is unconstitutional to restrict speakers from making personal attacks in City Council meetings; it chills speech critical of elected officials, which is speech at the heart of the First Amendment.

In [*60] one of the largest cities in the world, it is to be expected that some inhabitants will sometimes use language that does not conform to conventions of civility and decorum, including offensive language and swear-words. As an elected official, a City Council member will be the subject of personal attacks in such language. It is asking much of City Council members, who have given themselves to public service, to tolerate profanities and personal attacks, but that is what is required by the First Amendment. While the City Council has a right to keep its meetings on topic and moving forward, it cannot sacrifice political speech to a formula of civility. Dowd and Dogg "may be a gadfly to those with views contrary to [their] own, but First Amendment jurisprudence is clear that the way to oppose offensive speech is by more speech, not censorship, enforced silence or eviction from legitimately occupied public space." Gathright v. City of Portland, Or., 439 F.3d 573, 578 (9th Cir. 2006). The city that silences a critic will injure itself as much as it injures the critic, for the gadfly's task is to stir into life the massive beast of the city, to "rouse each and every one of you, to persuade [*61] and reproach you all day long." (Plato, Five Dialogues, Hackett, 2d Ed., Trans. G.M.A. Grube, 35 (Apology).)

The court GRANTS summary judgment to Plaintiffs on the as-applied challenge to the Rules of Decorum. The court declines to issue a preliminary injunction but finds that the provisions of the Rules of Decorum at issue here are constitutional only when there is an actual disruption beyond a per se breach of the Rules.

**3. California Constitution**

The California Constitution provides, "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." Cal. Const. art. I, § 2. "The California Constitution, and California cases construing it, accords greater protection to the expression of free speech than does the United States Constitution." Gonzales v. Superior Court, 180 Cal. App. 3d 1116, 1122, 226 Cal. Rptr. 164 (Ct. App. 1986). Because the California Constitution is more protective of free speech than the U.S. Constitution, the court finds that as applied the Rules of Decorum violate Article I § 2 as well. [13]

> [13] Due to insufficient briefing, the court declines to address [*62] whether the Rules of Decorum are facially unconstitutional under the California constitution.

**E. Damages Claims**

The City has presented evidence indicating that Plaintiffs did not suffer economic loss due to the 2008 Ordinance. (See, e.g., City Exhs. 28, 49, 68, 317, 325, 327-32, 335-44, 355-56, 360, 362.) Plaintiffs have presented evidence in the form of their declarations indicating that they suffered economic loss and potentially compensable emotional distress. (See, e.g., Saltsburg Decl. ¶ 74.) Emotional distress damages need not be based on objective evidence. Zhang v. American Gem Seafoods, Inc., 339 F.3d 1020, 1040 (9th Cir. 2003), citing Passantino v. Johnson & Johnson Consumer Prods., Inc., 212 F.3d 493, 513 (9th Cir. 2000). The court finds that there is an issue of fact as to the compensatory damages suffered by Plaintiffs and DENIES summary judgment on the issue of damages.

**IV. CONCLUSION**

For the reasons stated above, the court GRANTS summary judgment in favor of Defendants on the 2006 Ordinance. The court GRANTS summary judgment in favor of Defendants on the Permit and Lottery system, the height restriction, the rotation requirement, and the

2013 U.S. Dist. LEXIS 111435, *62

sunset requirement. The court GRANTS [*63] summary judgment in favor of Plaintiffs on the amplified sound ban. The court GRANTS summary judgment in favor of Defendants on the facial constitutionality of the Rules of Decorum under the United States Constitution, but GRANTS summary judgment in favor of Plaintiffs on their as-applied challenge to the Rules of Decorum under the United States Constitution and the California constitution. The court declines to issue a preliminary injunction but finds that the provisions of the Rules of Decorum at issue here are constitutional only when there is an actual disruption beyond a per se breach of the Rules. The court DENIES summary judgment on the issue of damages.

IT IS SO ORDERED.

Dated: August 7, 2013

/s/ Dean D. Pregerson

DEAN D. PREGERSON

United States District Judge

31

EXHIBIT 3

ORDINANCE NO. ___179807___

An ordinance amending Section 42.15 of the Los Angeles Municipal Code to prohibit vending and excessive noise on beaches or upon immediately adjacent boardwalks, sidewalks and public ways.

## THE PEOPLE OF THE CITY OF LOS ANGELES
## DO ORDAIN AS FOLLOWS:

Section 1.  Section 42.15 of the Los Angeles Municipal code is amended to read:

### SEC. 42.15.  VENDING AND EXCESSIVE NOISE ON BEACHES PROHIBITED.

A.  Except as specifically allowed in this section, no person shall engage in vending upon any public beach lands or beach properties adjoining the waterfront of the Pacific Ocean, or upon any immediately adjacent boardwalk, sidewalk or public way between the southerly boundary of the City of Santa Monica and the northerly boundary of the City of El Segundo and between the northwesterly boundary of the City of Santa Monica and the northwesterly boundary of the City of Los Angeles.

1.  Findings and Purpose.  The City Council of the City of Los Angeles finds and declares as follows:

(a)  The Venice Beach Boardwalk (Boardwalk) is a major tourist attraction in the City of Los Angeles.  The Boardwalk is historically significant as a traditional public forum for its performance and visual artists, as well as other free speech activity.  Unregulated vending adversely affects the historic character of the Boardwalk resulting in an economic and cultural loss to the City.  Therefore, the Boardwalk requires reasonable time, place, and manner restrictions to restore its unique historic character as a center of performance, art, and other free speech activity, preserve its status as a tourist attraction, protect the local merchant economy, and ensure the safety and enjoyment of residents, visitors, advocates, artists, performers, and vendors alike.  Due to its unique historical, geographical, and physical characteristics, the Boardwalk requires its own set of rules and regulations different from other public parks in the City;

(b)  Unregulated vending harms the Boardwalk, and therefore must be regulated because:

(i)  Tourists are deterred from visiting or shopping at the Boardwalk as they are constantly approached, solicited, and sometimes harassed by unregulated vendors.  It is therefore necessary to regulate the time, place, and manner of vending on the Boardwalk, in order to ensure that tourists are not deterred from visiting or shopping at the Boardwalk;

(ii)    The amount of space on the Boardwalk that is available for performing and visual artists and for political advocacy is limited due to the size of the Boardwalk and the large crowds of visitors that the Boardwalk attracts.  Due to the limited amount of space, unregulated vending along the Boardwalk prevents many persons from engaging in performance, art, advocacy or other expressive activities.  Prior to the City's Board of Recreation and Parks Commission establishing a program for assignment of spaces, unregulated vending resulted in conflicting claims for the available space.  There were numerous altercations over the locations and amounts of space that any one person or organization could use.  Frequently, the altercations became violent requiring law enforcement response to preserve the public peace. Persons wishing to secure spaces often arrived prior to dawn and created loud noises in setting up their displays, thereby disturbing the public peace and requiring a law enforcement response.  Unregulated, the Boardwalk became a place where only the strongest and earliest arrivals could secure space to exercise their rights of free expression without threat of intimidation.  It is, therefore, necessary to regulate the use of the limited space on the Boardwalk to prevent conflicting claims for the space and to allocate the limited space available fairly to all who desire to use it for lawful purposes.

(iii)    Tables, pushcarts, stands, or equipment of persons engaged in vending impedes the orderly movement of pedestrian traffic and may make the Boardwalk unsafe for pedestrians by limiting the City's ability to effect crowd management and control.  It is therefore necessary to regulate the use of equipment by vendors to manage the orderly movement of pedestrian traffic and avoid injuries to pedestrians;

(iv)    The vendors and their equipment may impede the ingress and egress of emergency and public safety vehicles by creating physical obstacles to emergency response and administration of aid to those in need of immediate medical attention and to victims of criminal activity.  It is therefore necessary to regulate vendors and their use of equipment to avoid interference with emergency response vehicles that provide assistance to individuals with medical needs and victims of criminal activity;

(v)    Unregulated vending undermines the Boardwalk's commercial life by reducing sales by local merchants operating on private property abutting and adjacent to the Boardwalk, thereby eroding the City's tax revenues due to unfair competition, and by offering additional opportunity for the sale of stolen, defective or counterfeit merchandise. It is therefore necessary to regulate vending to protect the local merchant economy and revitalize the Boardwalk, which requires a

vibrant and stable merchant, artist, performer and free speech advocacy community;

(vi)   Unregulated vending causes visual clutter/blight along the Boardwalk, impedes views of the beach and the Pacific Ocean, and threatens the City's ability to attract tourists and preserve businesses along the Boardwalk.  It is therefore necessary to regulate the number of vendors, the size of their equipment, and displays, and the location of vending activity;

(vii)   Unregulated vending creates unnecessary, excessive and annoying noise on the Boardwalk, is detrimental to the public health, welfare and safety and contrary to the public interest, harms residents, businesses and the historic character of the Boardwalk, and diminishes the quality of life for those who visit, live or work on or near the Boardwalk.  It is therefore necessary to establish restrictions on noise at the Boardwalk;

(viii)  The Recreation Area between Horizon Avenue and 20th Avenue is a site that frequently holds special events.  It is the location of a police substation where vehicles require the ability for unobstructed ingress and egress.  It is also where many people engage in skateboarding, paddle tennis, and other sports and exercise.  The Recreation Area between Horizon Avenue and 20th Avenue, therefore, requires a special permit system to regulate activity in that area, and prevent incompatible uses of space.

2.  Action.  To address these findings and purposes, the City has created reasonable time, place, and manner restrictions on vending.  To preserve the Boardwalk's rich history of fostering new artists, performance, and other free speech activity, the City has divided the available space on the Boardwalk between performers, advocates, artists, and those vending expressive items inextricably intertwined with a political, philosophical, religious or ideological message.  Therefore, the City has:

(a)   Created areas where persons can perform, engage in traditional expressive speech, and petitioning activities, and vend the following expressive items:  newspapers, leaflets, pamphlets, bumper stickers, patches, buttons, or books created by the vendor or recordings of the vendor's own performances (P-Zones);

(b)   Created areas where persons may engage in activities permissible in the P-Zone, and also engage in vending of expressive items created by the vendor, or the vending of expressive items that are inextricably intertwined with the vendor's message (I-Zones); and

3

(c)   Created reasonable time, place, and manner restrictions on activities outside those areas.

B. P-Zones.

1. Vending any item in the P-Zones not exempted by Subdivision 2 of this subsection is a violation of this section and is subject to the penalties described in Subsection H.

2. P-Zone Exemptions.  Subject to the permit requirements of Subdivision 4 of this subsection:

(a)   Any person may:

(i)  Vend newspapers, leaflets, pamphlets, bumper stickers, patches, or buttons; and

(ii)  Vend books created by the vendor.

(b)  Performers may vend audio, video, or other recordings of their performances; and

(c)  Any person may give away food, goods, merchandise, services, or performances, free of charge, and may ask for a donation subject to the condition that they shall display, visible to the public, a placard provided by the City stating:  "Donations appreciated.  No contribution required."  A person giving away items may limit the items given away to no less than one item per person per day.

3. P-Zone Spaces.  The Board will designate spaces on the Boardwalk for allocation in the P-Zones according to rules promulgated by the Board consistent with this section.  There shall be at least 105 spaces designated in the P-Zones.

4. P-Zone Permit System.  The allocation of spaces shall be determined according to the following permit system:

(a)  Permits required for assigned spaces in the P-Zones during Peak Season.  During the "peak season," defined as the Saturday before Memorial Day through November 1 of each year, any person desiring to occupy an assigned space shall obtain a permit, and, spaces shall be assigned to persons possessing a permit according to the rules promulgated by the Board consistent with this section.  P-Zone permits shall not be valid in the I-Zones.

(b)  Exception:  During peak season after 12:00 p.m. (noon), any person, whether or not a permit holder, may use any unoccupied space in the P-

Zones subject to all other provisions of this section; provided that if the permit holder to which the space was assigned arrives after noon and asks to use his/her assigned space, the person not assigned the space shall immediately relinquish the space to the assigned permit holder.

(c)  Permit Applications for the P-Zones during Peak Season.  An application requesting a non-transferable peak season permit for the P-Zones shall only require the applicant's name.

5.  Unassigned Spaces in the P-Zones.  Ten of the 105 designated P-Zone spaces shall be made available on a first-come, first-served basis for persons engaged in activity that is not vending and does not use amplified sound.  Two of those spaces shall be made available for persons giving away food.

C.  I-Zones.

1.  Vending any item in the I-Zones not exempted by Subdivision 2 of this subsection is a violation of this section and is subject to the penalties described in Subsection G.

2.  I-Zone exemptions.  Subject to the permit requirements of Subdivision 4 of this subsection:

(a)  All activities permissible in the P-Zones are also permissible in the I-Zones; and

(b)  Any person may vend the following items:  expressive items, which have been created, written or composed by the person, or are expressive items inextricably intertwined with the message of the person vending the items.  These items may include, but are not limited to, books, cassettes tapes, compact discs, digital video discs, paintings, photographs and sculptures.  For purposes of this paragraph, expressive items shall be deemed to have been created by the vendor only if they have been predominantly authored, performed, recorded, filmed, or otherwise made or assembled by the vendor.

3.  I-Zone Spaces.  The Board will designate spaces on the Boardwalk for allocation in the I-Zones according to rules promulgated by the Board consistent with this section.  There shall be at least 100 spaces designated in the I-Zones.

4.  I-Zone Permit System.  The allocation of spaces shall be determined according to the following permit system:

(a)  Permits required for use of space in the I-Zones.  I-Zone permits shall not be valid in P-Zones to vend items only permitted to be vended in the I-Zones.  However, I-Zone permits may be used in P-Zones for any

5

37

permissible P-Zone purpose.  No person shall occupy space in the I-Zone unless that person possesses a valid permit issued by the Department of Recreation and Parks.  After 12:00 p.m. (noon), any I-Zone permit holder may use an unoccupied space in the I-Zone subject to all other provisions of this section; provided that if the permit holder to which the space was assigned arrives after noon and requests to use his/her assigned space, the person not assigned the space shall immediately relinquish the space to the assigned permit holder.

(b)  Permit Applications for the I-Zones. Any person desiring to occupy an assigned space to vend items in the I-Zones shall file an application for a non-transferable permit with the Department of Recreation and Parks.  The application shall require:

(i)    The applicant's name and a mailing address at which the City may provide notice to the applicant;

(ii)   A description of the goods or merchandise for which the applicant seeks a permit;

(iii)  A declaration that the goods or merchandise for which the applicant seeks a permit are expressive items of the applicant's own creation or are inextricably intertwined with the message of the applicant.

D.  Special Rules for Areas on the Boardwalk Outside the P-Zones and I-Zones.

1.  Areas Outside the P-Zones and I-Zones.

(a)  Activities allowed without equipment on the Boardwalk outside the P-Zones, I-Zones and pagodas.  The following activity may occur in all areas covered by this section outside the P-Zones, I-Zones and pagodas, provided that no person may set up a display table, easel, stand, equipment or other furniture, use a pushcart or other vehicle or place any item on the property defined in Subsection A except as provided in Paragraph b of this subdivision:

(i)    Any person may vend newspapers, leaflets, pamphlets, bumper stickers, patches, or buttons, and books or recordings created by vendor.

(ii)   Any person may vend any other expressive item that is inextricably intertwined with the vendor's message.

(iii)  Any person may engage in any activity permissible in the P-Zones.

6

38

(b)  Activities allowed with limited equipment on the Westside of the Boardwalk outside the P-Zones, I-Zones or pagodas.  Any activity permitted in the P-Zones may occur on the Westside of the Boardwalk outside of the P-Zones, I-Zones or pagodas so long as the activity is not vending and does not substantially impede or obstruct pedestrian or vehicular traffic, subject to reasonable size and height restrictions on any table, easel, or other furniture in connection with that activity, as set forth in the Program Rules.

2.  Special Permit System for the Recreation Area between Horizon Avenue and 20th Avenue.

(a)  A permit is required for any activity in the Recreation Area that is engaged in by and/or attracts a crowd of 15 or more people.

(b)  No permit is required for an activity in the Recreation Area that is engaged in by and/or attracts a crowd of fewer than 15 people.  The activity shall not interfere with any other activity in the Recreation Area.

(c)  No vending, no amplified sound, and no display tables, easels, stands, equipment, pushcarts or other vehicles, or structures shall be allowed in the Recreation Area without a permit.

E.  Use of City Property for Vending, Performance, or Display Prohibited.  No person shall use or obstruct access to any City-owned or maintained street furniture or structure, including any pagoda, for vending, performance, or display of anything whatsoever, including but not limited to, use of any bench, planter or trash receptacle installed on public property.

F.  Noise Regulation for all property on or immediately adjacent to the Boardwalk.

1.  No person, group or business shall create any noise, or allow the creation of any noise, which causes the noise level to exceed the following Lmax levels between 9:00 a.m. and sunset:

(a)  75 dBA, when measured at a minimum distance of 25 feet from the source of the noise; or,

(b)  96 dBA, when measured at a minimum distance of one foot from the source of the noise.

When Lmax levels are measured from a building located on private property adjacent to the Boardwalk, the measurement shall be taken from the property line dividing the private property and the Boardwalk.

2.  Nothing in this section shall be construed as prohibiting the City from enforcing other provisions of this Code relating to noise.  At all times, the

provisions of Chapter 11 of the Los Angeles Municipal Code, Sections 111 through 115, inclusive, and Los Angeles Municipal Code Sections 41.42, 41.57, 53.63, 63.44 relating to noise shall apply.

3. No person or business shall interfere with or resist the taking of any noise measurement authorized by this section.

4. Amplified sound may be generated in the following designated P-Zone spaces subject to the other requirements of this section, and as long as any speaker or sound reproduction system is placed on the ground and is no more than three feet in height:

(a) Between 17th Avenue and Horizon Avenue;

(b) Between Breeze Avenue and Park Avenue.

5. Except as allowed by subdivision 4 of this subsection, amplified sound is prohibited on all property described in subsection A of this section.

6. Notwithstanding the regulations regarding amplified sound, the City may issue special event permits.

G. Enforcement.

1. Conduct subject to administrative enforcement. The Board may adopt rules consistent with this section for space allocation and reasonable time, place and manner regulation of the I-Zones and the P-Zones. Except as provided in Subsection H and Subdivision 2 of this subsection, violations of rules promulgated by the Board shall be subject to administrative enforcement by the City as follows:

(a) A permit may be revoked in accordance with the Program Rules adopted by the Board for violations of any provision of this section or the Program Rules. Revocation shall occur upon a third violation of a Program Rule, a third violation of the conditions set forth in this section, or a combination of any three violations of the Program Rules or conditions set forth in this section. A notice of violation of the Program Rules may be appealed to the Department of Recreation and Parks District Supervisor. Revocation of a permit may be appealed to the Panel of Vending Permit Appeals. No action of the Panel of Vending Permit Appeals may be taken by less than a majority of its members. The conclusion of the applicable appeal process shall constitute an exhaustion of administrative remedies pursuant to California Code of Civil Procedure Section 1094.5.

(b) Only those persons who obtain I-Zone permits may invoke the administrative appeals process described in Subparagraph (a) of this

subdivision.  Persons vending without a permit in the I-Zones shall be subject to the penalties described in Subsection H.

2.  Conduct subject to criminal penalties.  Conduct in the P-Zones or the I-Zones that is prohibited by the following paragraphs shall be subject to the penalties described in Subsection H:

(a)  No person shall place or allow anything in any designated space that extends beyond the boundaries of the designated space.

(b)  No person shall place or allow any item (except an umbrella or other sun shade) exceeding four feet above ground in any designated space, nor shall any person cause or allow a designated space to be enclosed on more than two sides.

(c)  No person occupying a space shall leave that space for a period longer than 45 minutes without first removing all items from the space.

(d)  No person, business or group shall occupy more than a single space at any given time, nor shall any person, business or group solicit another person to obtain or occupy a space on their behalf.

(e)  No person shall purchase, sell, barter or exchange any assigned space with any other person.

(f)  No person shall set up or take down or use a designated space between sunset and 9:00 a.m.

3.  No person shall alter or reproduce any permit issued pursuant to this section, nor shall any person possess an altered, reproduced or falsified permit document.  A violation of this paragraph shall be subject to the penalties described in Subsection H.

H.  Violations.  Except for the administrative enforcement provided in Subdivision 1 of Subsection G, any person violating a provision of this section shall be subject to the following penalties:

1.  First offense.  Infraction.

2.  Second offense.  Infraction.

3.  Subsequent offenses.  Misdemeanor.  The violation of any provision, which would otherwise be an infraction, shall be a misdemeanor if the person who has violated that provision has previously been convicted of two or more violations of this section within the 24-month period immediately preceding the

41

current offense.  For purposes of this subsection, a bail forfeiture shall be deemed to be a conviction of the offense charged.

I.  Opening and Closing Hours.  No person shall engage in activities not otherwise prohibited by this section between the hours of 10:30 p.m. and 9:00 a.m.

J.  Posted Notice.  The City shall post signs in the P- Zones and the I-Zones providing notice of the rules of use of each Zone consistent with this section.

K.  Severability.  If any provision or application of a provision of this section is held invalid, the remainder of the section and application of its provisions will not be affected.

L.  Definitions.  For purposes of this section, the following words or phrases shall have the following meanings:

1.  Performance/Free Speech Zones (P-Zones).  Areas on the Boardwalk designated by the City, located south of Clubhouse Avenue and north of 17th Avenue, south of Park Avenue and north of Wavecrest Avenue, and south of Paloma Avenue and north of Sunset Avenue in which the City will allocate spaces for performers and speakers.  Vending shall be prohibited in this area except as provided in Subdivision 2 of Subsection B of this section.

2.  Inextricably Intertwined Speech Zones (I-Zones).  Areas on the Boardwalk designated by the City, located south of Wavecrest Avenue and north of Clubhouse Avenue, south of Sunset Avenue and north of Park Avenue, and south of Navy Street and north of Paloma Avenue, in which the City will allocate spaces for the vending of expressive items that are created by the vendor or inextricably intertwined with speech.  Vending shall be prohibited in this area except as provided in Subdivision 2 of Subsection C of this section.

3.  Amplified Sound.  Sound produced with sound amplifying equipment as defined in Los Angeles Municipal Code Section 111.01 (j), and shall not include sound produced solely by acoustical musical instruments.

4.  Board.  The City's Board of Recreation and Park Commissioners.

5.  City.  The City of Los Angeles, a municipal corporation, acting by or through any of its officers, employees or agencies, including, but not limited to, the City's Department of Recreation and Parks.

6.  Donation.  A gift; a voluntary act which is not required and does not require anything in return.

7.  Food.  Any type of edible substance or beverage.

8.  Goods or Merchandise.  Any items that are not food.

9.  Pagodas.  The structures, including the ten foot area fronting each structure, located on the Boardwalk at Clubhouse Avenue, Breeze Avenue, Park Avenue, Sunset Avenue and Dudley Avenue.

10.  Panel of Vending Permit Appeals.  A three-person board consisting of: a representative from the Park Advisory Board designated by the Board of Recreation and Park Commissioners; a Boardwalk community member designated by the City Councilmember of the district in which the Boardwalk is located; and the General Manager of the Department of Recreation and Parks or the General Manager's designee.

11.  Person.  An individual or an organization composed of two or more individuals.

12.  Program Rules.  Rules adopted by the Board consistent with this section.

13.  Pushcart.  Any non-motorized mobile device that holds food, goods or merchandise as defined in this subsection, and is used to vend.

14.  Recreation Area between Horizon Avenue and 20th Avenue.  This is the area that includes a police substation, Muscle Beach, paddle tennis courts, and other recreational facilities.  This does not include the Westside of the Boardwalk immediately adjacent to this area.

15.  Vend or Vending.  To sell, offer for sale, expose for sale, solicit offers to purchase, or to barter food, goods, merchandise or services in any area from a stand, table, pushcart, motor vehicle, bicycle, or by a person with or without the use of any other device or other method of transportation, or to require someone to pay a fee or to set, negotiate, or establish a fee before providing goods or services, even if characterized by the vendor as a donation.

16.  Vendor.  A person who vends.  This includes a vendor who is an employee or agent of another.

17.  Westside of the Boardwalk.  The area on the ocean-side of the Venice Beach Boardwalk.

Sec. 2.  The City Clerk shall certify to the passage of this ordinance and have it published in accordance with Council policy, either in a daily newspaper circulated in the City of Los Angeles or by posting for ten days in three public places in the City of Los Angeles:  one copy on the bulletin board located at the Main Street entrance to the Los Angeles City Hall; one copy on the bulletin board located at the Main Street entrance to the Los Angeles City Hall East; and one copy on the bulletin board located at the Temple Street entrance to the Los Angeles County Hall of Records.

I hereby certify that this ordinance was passed by the Council of the City of Los Angeles, at its meeting of _____APR 0 9 2008_____.

KAREN E. KALFAYAN, City Clerk

By _____
                                              Deputy

Approved _____APR 16 2008_____

_____
                              ACTING Mayor

Approved as to Form and Legality

ROCKARD J. DELGADILLO, City Attorney

By _____
          MARK L. BROWN
          Sr. Assistant City Attorney

Date _____4 – 8 – 08_____

File No. CF # 07-2112_____

M:\General Counsel (GC)\MARK L. BROWN\ORDINANCES\March 27 draft of LAMC sec. 42.15.doc

12

44

EXHIBIT 4

1  MATTHEW DOWD, an individual
   PETER DEMIAN, an individual
2  EDWARD LA GROSSA, an individual
   ANTHONY BROWN, an individual
3  NATHAN PINO, an individual
   WILLIE LEE TURNER an individual,
4  DAVID 'ZUMA DOGG' SALTSBURG, an individual,
   THOMAS BURRUM JNR, an individual,
5  MARVIN SIMS, an individual,
   JESSE BROWN, an individual,
6  LOUIE GARCIA, an individual,
   RENE CASTRO, an individual.
7

8  10 ½ 27th Place
   VENICE, CA 90291
9  T. (310) 985-5436

10 E. matt2000dowd@yahoo.com

11 Plaintiffs in pro per

12

13          UNITED STATES DISTRICT COURT

14         CENTRAL DISTRICT OF CALIFORNIA

15                                    CV09-6731 AHM (RZ)

16 MATTHEW DOWD, an individual; PETER      )   COMPLAINT
   DEMIAN, an individual; EDWARD LA        )   FOR DECLARATORY AND
17 GROSSA, an individual;  ANTHONY BROWN,  )   INJUNCTIVE RELIEF;
   an individual; NATHAN PINO, an individual; )   REQUEST FOR DAMAGES
18 WILLIE LEE TURNER, an individual;  DAVID )
   'ZUMA DOGG' SALTSBURG, an individual;   )   42 U.S.C. §1983;   Violation of
19 THOMAS BURRUM JNR an individual;        )   First Amendment. Violation of
   MARVIN SIMS, an individual; JESSE BROWN, )   Fourteenth Amendment.
20 an individual; LOUIE GARCIA, an individual, )   Unconstitutional Statutes.
   RENE CASTRO, an individual              )
21                                         )   Notice of Related Cases
                                           )   [Filed concurrently herewith]
22                                         )
                                           )   Notice of Interested Parties
23 vs.                                     )   [Filed concurrently herewith]
                                           )
24 CITY OF LOS ANGELES,                    )
           a municipal corporation         )
25 ─────────────────────────────────────  )

26

27

28

                          1

                                                    46

```
9/16/2009 2:17:30 PM  Receipt #: 122660
          Cashier : KPAGE [LA 1-1]
Paid by: MATTHEW DOWD ET AL
2:CV09-06731
2009-086900      5 - Civil Filing Fee(1)
Amount :                          $60.00
2:CV09-06731
2009-510000     11 - Special Fund F/F(1)
Amount :                         $190.00
2:CV09-06731
2009-086400      Filing Fee - Special(1)
Amount :                         $100.00
Cash  Payment :                   350.00
```

47

**JURISDICTION AND VENUE**

1. As this case involves questions which arise under the Constitution and the laws of the United States, the jurisdiction of this court is invoked pursuant to 28 U.S.C. § 1331. The Court has jurisdiction to issue relief pursuant to the Declaratory Relief Act,  28 U.S.C. § 2201 and 2202. This court has jurisdiction to hear Plaintiffs' pendent state claim through the doctrine of supplemental jurisdiction set forth at  28 U.S.C. § 1367.

2. Venue is proper for the United States District Court for the Central District of California under 28 U.S.C. § 1391 (b). Defendants reside in the Central District, and the acts and omissions complained of herein have occurred and will occur in the Central District.

**INTRODUCTION**

3. This is an action for damages, also injunctive and declaratory relief to enjoin enforcement of two municipal codes, and a section of City Council rules, adopted by the defendant City of Los Angeles (hereinafter "CITY"), all of which violate, or have violated, Plaintiffs' First, Fifth and Fourteenth Amendment rights.  Plaintiffs are artists and performers who are actively involved in expressive activities on the Venice Boardwalk ("BOARDWALK"). The defendant is a municipal corporation who enacts and enforces laws on the Boardwalk and within its public meetings.  Plaintiffs together allege past, present and future damages not only from the two beach vending ordinances (LAMC 42.15 2006, and 2008), but also from Rule 12 of the Los Angeles City Council Rules ("Rules of Decorum").

4. There are three parts to this action. All named Plaintiffs bring these claims for damages and injunctive and declaratory relief against LAMC 42.15 [2008] also known as Ordinance No. 179,807 Effective 5/19/08. (hereinafter referred to as "2008") . Plaintiffs DEMIAN, SALTSBURG, BROWN, TURNER, and JESSE also pray for damages and declaratory relief from LAMC Amended Section

1   42.15  adopted on March 25, 2006 as Ordinance Number 177337  (hereinafter

2   "2006"), and which is already suspended,  and DOWD and SALTSBURG

3   further claim damages and injunctive and declaratory relief from the Rules of

4   Decorum (hereinafter "DECORUM") adopted by the CITY and amended July

5   2009.

6   5. Plaintiffs contend and thereby allege that these aforementioned ordinances

7   and rules and their enforcement violate the First, Fifth and Fourteenth

8   Amendments to the United States Constitution and Article 1, Section 2 of the

9   California Constitution as impermissible prior restraints on protected expression

10  in a public forum. In addition, Plaintiffs contend and thereby allege that these

11  aforementioned ordinances and rules are not reasonable time, place and manner

12  regulations because they invite content-based decision making and do not leave

13  open ample alternatives for the desired means of communication. Plaintiffs also

14  contend that these aforementioned ordinances and rules are impermissibly vague

15  laws which thereby allow authorities unbridled discretion because of a  lack of

16  adequate guidelines to help describe those activities which are allowed or

17  denied.

18  6. This challenge is on both facial and as-applied grounds on all three challenged

19  statutes. The facial challenges on "2008" will focus on void for vagueness, the

20  lack of ample alternative means of communication, including challenges on the

21  additional 'PROGRAM RULES' which the CITY has adopted and enforced in

22  conjunction with "2008", which are not reasonable time place and manner

23  regulations; on vagueness and overbreadth grounds on "2006"; and on

24  vagueness, content neutrality and overbreadth grounds on the "DECORUM".

25  The as-applied challenges will be detailed separately in the factual information

26  as general applications, and as pertaining to individual Plaintiffs in specific

27  circumstances.

28

## PARTIES

7.   Plaintiff MATTHEW DOWD ("DOWD") is an individual who has been actively conducting expressive activities on the Boardwalk since obtaining a permit from the City in 2005. While known for promoting his original incense flavor, DOWD is also a well known musician and performer who sings and plays electric guitar. DOWD offers his three music CDs of his own recordings, on the Boardwalk. DOWD also accepts donations in an open guitar case. DOWD is also a political activist and often intertwines political messages with his music during a street performance. DOWD is also a communicator of news and information to other individuals regarding the ongoing Boardwalk litigation and regarding changes and details within the City vending ordinance. DOWD has also attended hundreds of Los Angeles City Council meetings to address the Council on political matters within that jurisdiction.

8.   PETER DEMIAN ("DEMIAN") is a street performer and musician who plays electrified guitar and sings using an amplifier and microphone on the Venice Boardwalk. He has performed continuously for 25 years. He sells his self titled CD of his own recordings, and also has a T shirt for sale which displays his name and his long time slogan "Street Smart". He accepts donations in an open guitar case.

9.   EDWARD LAGROSSA ("LAGROSSA") is a street performer and musician who plays guitar and sings using an amplifier and microphone on the Venice Boardwalk. He has performed continuously for 20 years on and around the Venice Boardwalk. He accepts donations in an open guitar case and offers a self titled CD of his own recordings.

10. ANTHONY BROWN ("BROWN") is a street performer rapper singer and spray paint artist who promotes African American achievement in history through his spray paint works and his hip-hop rap vocal performances. His songs strongly feature messages of peace and love and his Agape religious

1  philosophy. His art works on canvas and T-shirts feature images of famous
2  philosophers and musicians with an additional message inscribed across each
3  one. He accepts donations in a tip jar and offers his art work for a suggested
4  donation.

5     11. NATHAN PINO ("PINO") is a street performer who plays an upright
6  piano on the Boardwalk. PINO has been playing piano on the Boardwalk daily
7  since 2006. He accepts donations in a bucket placed on the piano.

8     12. WILLIE LEE TURNER ("TURNER") a.k.a. 'SOLOMON' is a street
9  performer who stands on a ladder while holding rubber snakes and issuing
10 positive greetings to passers-by, intertwined with political statements about the
11 state of the Union and the economy and the administration of government. He
12 also rides a small unicycle as part of his show. TURNER has been street
13 performing at the BOARDWALK for seven years.

14    13. DAVID SALTSBURG ("SALTSBURG") a.k.a. 'ZUMA DOGG' is a street
15 performer who sings, dances and raps, and delivers comedy routines and lines to
16 passers-by on the Boardwalk. SALTSBURG has been performing on the
17 BOARDWALK for five years. SALTSBURG accepts donations for his
18 performance in an open plastic container, and offers his  DVD of his own TV
19 public access show recordings, and his 'Zuma Dogg' T-shirt, which carries his
20 name 'Zuma Dogg' and his character image. SALTSBURG has also attended
21 hundreds of Los Angeles City Council meetings since 2006 to address the
22 Council on political matters within that jurisdiction. During the course of his
23 political activism SALTSBURG has run for Mayor of Los Angeles, and has
24 made a run for a Los Angeles City Council seat.

25    14. THOMAS BURRUM JNR. ("BURRUM") is a street performer who plays
26 guitar and sings using an amplifier on the BOARDWALK. He also accepts
27 donations for his performances in an open guitar case.

28

15. MARVIN SIMS ("SIMS") is a street performer who plays saxophone along with prerecorded backing tracks. He has been performing on the Boardwalk for seven years. He offers his original CD of instrumental tracks which are his own recordings.

16. JESSE BROWN (hereinafter "JESSE") is a street artist who creates his artwork on wooden skateboard decks, by burning an image into the wood using a magnifying glass and the sun. JESSE has been practicing this artwork on the Boardwalk since 2005.

17. LOUIE GARCIA ("GARCIA") is a drummer and street performer who performs on the Boardwalk. He has been performing for one year. He also accepts donations via an open tip container.

18. Defendant CITY OF LOS ANGELES ("CITY"), is a municipal entity, organized under the laws of the State of California with the capacity to sue and be sued. The CITY is the legal and political entity responsible for the actions of the officers and employees of the Los Angeles Police Department ("LAPD"), which enforces the ordinances in question, and is also responsible for the actions of the Department of Recreation and Parks ("DPR"), which adopts rules and regulations during the implementation of these ordinances, and which employs Boardwalk administrators to oversee permit holders' activities and report what they consider to be violations of the ordinances in question. The City is being sued in its own right and on the basis of the acts of its officers, employees, and agents which were taken pursuant to CITY custom and policy. At all times acting under color of state law.

**FACTUAL ALLEGATIONS**

**Part.1  LAMC 42.15 (2008)**

19. LAMC 42.15 (2008) is a municipal ordinance which intends to regulate vending and excessive noise on City beaches, but more specifically Venice Beach, the traditional and official 'free speech' zone designated as such on the

1   West side of the Venice Boardwalk. This ordinance is the latest version in a
2   series of similar ordinances which have failed constitutional scrutiny over the
3   years and which have restricted protected activity and eventually been repealed
4   and/or suspended. This latest version is Ordinance No. 179807, and was effected
5   on May 19, 2008. Plaintiffs (except JESSE) are street performers who before the
6   introduction of this ordinance positioned themselves along the seventeen blocks
7   of traditional Boardwalk at locations where there are outdoor cafes, al fresco
8   dining, or other listeners and observers to whom they could perform. The zone
9   ordinance of "2008" allocates I and P spaces in front of many of the cafes, but
10   more importantly, it denies the use of amplifiers on twelve out of the seventeen
11   blocks on the Boardwalk. Many of the amplifier prohibition blocks contain these
12   cafes where Plaintiffs were performing with permits issued by the City prior to
13   May 2008. This current ordinance does not provide an ample alternative means
14   of communication for these performers.
15   20. The eight most northern blocks of Venice Boardwalk have a complete ban
16   on amplified music. These spaces on these blocks are all I zone designation, and
17   are filled with vendors permitted by the City to vend items "inextricably
18   intertwined with the speech of the vendor". Since all of the five 'amplifier
19   allowed' blocks are designated within the P zone, all musicians and performers
20   who use an amplifier must vie for space within those five blocks. Since that
21   zone is designated by lottery, the street performers have to enter the lottery to
22   win a space. The P zone lottery is also frequented by many vendors and other
23   expressions which do not use amplified sound. These include psychic readers,
24   henna tattoo artists and other vendors who may or may not qualify. Because of a
25   lack of enforcement for many months of the donation requirement' in the P
26   zone, many I zone permit holders moved back into the P zone and into the P
27   lottery. The P zone lottery now contains vendors who display large photos,
28   paintings, jewelry and clothing, and which common sense would conclude these

7

1  items are not being given away by donation, simply because they are
2  individually valuable items. The vendors display the sign "Donations accepted.
3  No contribution required." but display it in the most inconspicuous place
4  possible. A photographic record on Saturday June 13, 2009 showed forty nine P
5  spaces being occupied by jewelry, clothing, and paintings or photo vendors.
6  21.   Street performers often do not 'win' a space in the lottery. Only five blocks
7  in the P zone out of a total of nine are available to amplifier performers. This is
8  only fifty six spaces in total out of 105 P spaces. Eight are 'unassigned' non-
9  lottery spaces, and are also 'non-amplifier' These remaining 48 spaces out of a
10 Boardwalk total 205 spaces represents less than 25% of the Boardwalk open to
11 an individual with an amplifier. An amplifier is essential for speech, singing,
12 and because many musical instruments are electric. There is also abundant
13 ambient noise and amplified music blaring from commercial stores which will
14 drown out acoustic or a cappella performances. When the CITY allows other
15 expressions with photos and paintings and other I zone activities to take P zone
16 allocations in the lottery, it reduces the Plaintiffs' opportunity more
17 significantly. This now happens in every lottery. All of these amplifier spaces
18 are also next to each other which in itself is defeating for all users.

19 **PERFORMANCE SPACES**

20 22. Within the 100 space P zone, the City has designated five non lottery large
21 performance spaces of which four only are within the amplified sections. These
22 are the spaces remaining where a musician or performer can work once the
23 lottery spaces have been allocated. The first two of these spaces, A and B, are
24 taken daily by the same performers, who resist any other participants and who
25 rotate between themselves, doing large street theater comedy shows. Space D is
26 also commandeered by the same two performers, who intimidate or deter other
27 performers' participation. Plaintiffs in this action  (except artist "JESSE" ) are
28 all forced to congregate in Space C, because it is the only remaining Performer

1  Space which is available to them, is situated in front of a café, and in which they

2  are allowed to use an amplifier. This space is designated first come-first served,

3  and so often more than three or four musicians including some of these

4  Plaintiffs will all be trying to obtain performance time in this space. There have

5  been times when up to eight of these named Plaintiffs have been required to

6  'rotate' performances in this space. SALTSBURG quit performing from the

7  space completely for 8 months now because of the sometimes confrontational

8  nature of rotating with numerous performers and arguments over priority and

9  timing of each performer's show. Plaintiff DOWD has severely reduced his

10  attendance because of the limited opportunity and the long wait between shows,

11  sometimes up to 4 hours, when five performers are doing forty five minute

12  shows each in that space.

13  23. When these individual Plaintiffs' do finally obtain a 'turn' in the

14  Performance Space, they are often forced to quit their show when other

15  spontaneous and noisy individuals walk down the Boardwalk and attempt to

16  captivate the crowd of listeners already being addressed by the permitted

17  performer who is confined in that performer space. The CITY contends that the

18  ordinance is designed to protect musicians and other expressive speech, but then

19  it does nothing to protect those musicians with permits, in a limited space, from

20  these spontaneous non 'permitted' intruders.

21  **VOID FOR VAGUENESS**

22  24. The CITY has introduced an "I" zone which contains 100 spaces, and which

23  has been designated for "P" activities, and for the sale of "expressive items

24  created, written, or composed by the person", and for the sale of "expressive

25  items inextricably intertwined with the speech of the person vending the item".

26  This final sentence fails scrutiny because there are no guidelines to explain

27  exactly what items or speech, or interaction of the two, would make an item

28  "inextricably intertwined" with the speech. While the CITY does list items

9

1  which are acceptable in this zone, those listed items all qualify under the first
2  consideration of 'items created, written or composed...' The listed items are
3  books, cassette tapes, compact discs, digital video discs, paintings photographs
4  and sculptures. The list of items states "these items may include, but are not
5  limited to....". It is the "not limited to" items that need the guidelines. The listed
6  items all contain pure speech components of either visual or oral speech. The
7  "inextricably intertwined" designation contains no specific guidelines and as
8  such allows unbridled discretion to the enforcing authority.

9  25. Since there are no specific guidelines on "inextricably intertwined", the
10  CITY can and does issue permits, and conversely deny permits under this vague
11  designation. Because the CITY has oversubscribed the I zone lottery, with
12  vendors who may or may not qualify as "intertwined", many of the more
13  traditional vendors who sell those actual listed items, including photos and
14  paintings, have moved back into the P zone, into the P zone lottery, and are
15  taking spaces which are on amplifier only blocks.

16  26. The CITY also does use this term "inextricably intertwined" when
17  describing vending activities permitted outside of P zones and I zones.  LAMC
18  42.15 (1) (a) (ii) exempts specifically "any other item inextricably intertwined
19  with the vendor's message", but fails to provide any explicit instruction as to
20  how this standard works or is to be applied.

21  27. Subsection L of LAMC 42.15 2008 contains a heading "Definitions". Then,
22  "For purposes of this section, the following words or phrases shall have the
23  following meanings: " . L (2) is "Inextricably Intertwined Speech Zones (I-
24  Zones). ". The definition contained is a physical street location describing the I
25  zones, followed by ... "...in which the City will allocate spaces for the vending
26  of expressive items that are created by the vendor OR inextricably intertwined
27  with speech." Again, no direct or explicit guidelines to help one determine
28  exactly what makes an item just '"inextricably intertwined with speech". Prior to

1  this definition the ordinance specified "inextricably intertwined with the

2  *vendor's* speech.

3  **UNCONSTITUTIONAL AS APPLIED.**

4  28. While the CITY has adopted the 2008 version of LAMC 42.15, it also has

5  adopted Program RULES with which the CITY will further regulate activity and

6  attempts to describe or translate the ordinance. These program rules in their

7  application failed constitutionality on many occasions.

8  DONATION SIGN REQUIRED IN I ZONE.

9  29. On the very first day of the new ordinance, after months of discussion, and

10  supposed outreach, the senior CITY official overseeing the enforcement of

11  42.15 [2008], instructed and mandated that all P zone AND I zone vendors

12  display a "donation" sign provided by the CITY. In fact, the ordinance only

13  requires that P zone vendors carry the sign. The I zone is for sales.

14  ITEMS OVER FOUR FEET TALL PROHIBITED.

15  30. Plaintiff DOWD was cited and prosecuted under the PROGRAM RULES

16  for allowing an item over four feet tall in a designated space. DOWD is a

17  performer who stands upright to play electric guitar and sing into a microphone.

18  DOWD stands six foot tall and requires a microphone stand approximately five

19  foot six inches tall. DOWD also uses stage 'props' during a performance, and

20  one is a cardboard life size cut-out of Disney singer Hannah Montana. The

21  figure stands around five foot tall. Children and others like to have their picture

22  taken with it, and DOWD refers to the image during comments he makes in

23  between songs. The image helps draw attention to DOWD's performance and

24  messages.

25  31. The RULES state in part, (Program regulations #6) "Items, such as,

26  structures, fixtures, furniture, tents, equipment or displays of any kind cannot

27  extend higher than four (4) feet above the ground, except an umbrella or sun

28  shade." . DOWD and other performers use microphone stands, ladders and other

11

1  equipment over four feet tall in order to perform a show, which would clearly
2  violate the rules. One street performer, a juggler, performs his show atop a six
3  foot high stepladder. An LAPD officer, however, only took exception to the
4  cardboard cut-out display and insisted DOWD remove it or lower it. DOWD
5  requested the citation be written because already the officer had ignored the
6  almost six foot tall microphone stand, walked right by it in fact, to challenge the
7  cardboard image. DOWD was cited for having a cardboard cut-out over four
8  feet tall, and a microphone stand over four feet tall.  (DOWD insisted the officer
9  add the mic stand and not ignore it). DOWD was prosecuted for the image
10  display being over four feet tall, but the microphone stand was ignored in the
11  prosecution. The cardboard image itself was not even actually within a
12  designated space but was standing alone nearby. CITY has refused to cite other
13  performers who use items over four feet tall within a designated space. When
14  prompted by DOWD for a reason why the other performers were not being cited
15  for their items or equipment, the senior officer explained that there was 'no
16  reason'. Another officer explained that a cardboard cut-out image and a 6ft
17  ladder 'were two separate things' and so somehow that makes a difference.
18  DOWD and the other performers continue to use their equipment (stands and
19  ladders) which are over four feet tall, and are not being cited or prosecuted.
20  DOWD has stopped displaying the cardboard image for fear of further
21  prosecution.

22  PERFORMER ROTATIONS

23  32. CITY has designated five spaces as 'large group or performer only',  defined
24  as a show which 'has an average of twenty five or more spectators'. The RULES
25  state in part that these spaces may be rotated between performers on the hour,
26  but no guidelines are given as to exactly how many performers shall rotate,
27  whether the performers can 'cap' the number of participants in the space, nor
28  how an 'average' number of spectators can be assessed. On more than one

1 occasion LAPD officers arrived at the space and ordered certain performers to
2 vacate because there were not twenty five spectators on average and so the
3 performer was deemed not to be a large act.
4 Other acts were then awarded the space by the police. On another occasion when
5 DOWD and PINO were rotating within Space C with another third performer,
6 and had their names written in rotating order on a clipboard supplied by the
7 CITY, an LAPD sergeant, the senior beach patrol officer, responded to a
8 complaint from another performer and dictated performance times within the
9 space, and rearranged the order in the list which the Plaintiffs had already
10 established among themselves, given the blessing and the official clipboard
11 supplied by a CITY official. DOWD and PINO were threatened with arrest if the
12 officer's instructions were not followed with regard to performance times and
13 participants.
14 CD SALES ARE EXEMPT FROM THE DONATION REQUIREMENT
15 33. Plaintiff DEMIAN was performing in the Performer Space C in the P zone
16 when he was approached by an LAPD senior lead officer who ordered him to
17 remove the price of $15 from his sign promoting his original CD, and ordered
18 him to display the "Donations accepted. No contribution required." sign.
19 However, LAMC 42.15 2008 specifically exempts CD's and books from the
20 donation requirement. DEMIAN has been threatened with arrest and citation if
21 not complying with the order. This instruction came over nine months after the
22 introduction of the ordinance and was made by an officer who has written
23 dozens of citations on the BOARDWALK, and is considered one of the most
24 experienced in Boardwalk enforcement.
25 DEMIAN still is unsure about the regulation and is chilled in his activities with
26 regard to his price sign.
27 34. Plaintiff SIMS was performing in the P zone (#84) with his saxophone, and
28 was offering his CDs for sale as allowed by the statute. On May 23, 2009,

13

1   approximately a whole year after introduction of "2008", SIMS was cited by an
2   LAPD officer under 42.15 (B) (2)(c) "failing to display the sign "Donations
3   Appreciated, No Contribution Required". Citation No. 10795.
4   The ordinance though does provides an exemption for CD sales in the P-zones,
5   and a donation sign is NOT required in this instance. Although a first or second
6   offense is noted in the statute as an infraction, SIMS was cited on the ticket as a
7   Misdemeanor. It was his first citation.
8   AREAS OUTSIDE 0F P-ZONES AND I-ZONES
9   35. Plaintiff PINO was cited on August 09, 2009, for playing an acoustic piano
10  outside of the vending zones, and not in an assigned space. The ordinance
11  provides however as Subsection D (1) (b) states, in significant part: "Any
12  activity permitted in the P-zones may occur on the WEST side of the Boardwalk
13  outside of the P-zones, I-zones or pagodas so long as the activity is not vending
14  and does not substantially impede or obstruct pedestrian or vehicular traffic." No
15  mention is made in the citation about obstruction or impeding or vending, in
16  fact, the main notation on the citation concerns the fact that PINO is "asking for
17  tips in black hat".  Citation also adds that 'warned numerous times prior' which
18  would indicate that this application was repeated numerous times. Since PINO
19  was conducting a P zone permitted activity, was accepting donations, and was
20  tucked into a corner, his activity qualifies as permitted under 42.15 D (1) (b).
21  36. Plaintiff TURNER is the 'snake guy' who stands atop a four foot ladder and
22  cries out greetings and political statements to the public while holding fake
23  rubber snakes and wearing a loin cloth. The activity is spontaneous and
24  expressive, and is permitted P-zone activity but should also be permitted in
25  those other areas as described above and in 42.15 D (1) (b). TURNER has been
26  harassed and forced to leave the open square area in Windward Circle which
27  was his preferred location, and which qualifies as an expressive area under the
28  subsection D. Police have insisted and threatened with arrest if TURNER does

1  not restrict his activity to an actual designated space in a zone. Subsection D (1)

2  (b) also states in part : "….subject to reasonable size and height restrictions on

3  any table, easel, or *other furniture* in connection with that activity, as set forth in

4  the Program Rules." While the program rules give size and height restrictions on

5  "a table or easel", there is no guideline at all to describe what 'other furniture'

6  may be consisting of, or any guides to size or height restrictions which exist

7  specifically for that 'other furniture'.  Therefore 'other furniture" is restricted or

8  allowed only by the term "reasonable". This is completely subjective and allows

9  discretionary enforcement.

10  NON-AMPLIFIED ZONE

11  37. Plaintiffs PINO and CASTRO can also perform acoustically without

12  amplifiers [PINO has a piano, and CASTRO has acoustic drums]. On one

13  occasion recently they entered the I-zone to perform near a café within permitted

14  hours, and without amplification of any kind. Shortly thereafter LAPD officers

15  attended the location on the basis of a complaint from a resident and threatened

16  these plaintiffs with citation and confiscation of equipment if they did not

17  immediately cease and desist the activity. At no time were any sound

18  measurements made and plaintiffs were performing in a designated space.

19  Rather than face criminal sanctions and/or confiscation, the plaintiffs ceased the

20  activity.

21  38. LAMC 42.15 "2008" also makes reference to other City codes which are

22  enforceable with regard to noise. Subsection F (2) states in part: "…At all times,

23  the provisions of Chapter 11 of the Los Angeles Municipal Code, Sections 111

24  through 115, inclusive, and LAMC Sections 41.42, 41.57, 53.63, 63.44 relating

25  to noise shall apply. One of these codes

26  Sec.115. 02 (f)  states: "Sound emanating from sound amplifying equipment

27  shall be limited in volume, tone and intensity as follows:  1. The sound shall not

28  be audible at a distance in excess of 200 feet from the sound equipment.

15

1   2.   In no event shall the sound be loud and raucous or unreasonably jarring,

2   disturbing, annoying or a nuisance to reasonable persons of normal sensitiveness

3   within the area of audibility."

4   This language contains vague terms which by this statute could also be enforced

5   on these Plaintiffs.

6   ENFORCEMENT AND INTIMIDATION

7   39. Subsection F of "2008" Part 1. states: No person….shall create any noise, or

8   allow the creation of any noise which causes the noise level to exceed the

9   following Lmax levels between 9.am and sunset…". This implies that excessive

10   noise is prohibited between these hours. DOWD reads the ordinance as allowing

11   other sound outside these hours as permitted by Part 2 of this subsection F,

12   which allows enforcement of other codes relating to noise. One listed code is

13   LAMC 63.44 and part 6.  provides:   "No person shall play any musical

14   instrument between the hours of 10:00 p.m. and 7:00 a.m. within seven hundred

15   and fifty (750) feet of any structure used for dwelling purposes, except within or

16   upon an area or facility set aside for this purpose by the Board or Department.

17   For purposes of this subdivision, the term "musical instrument" includes but is

18   not limited to drums and other percussion devices."   One Sunday evening not

19   long after sunset , and after waiting several hours, DOWD was playing electric

20   guitar in Performer Space C with a large crowd of spectators when an LAPD

21   patrol stopped and immediately ordered DOWD to quit the performance.

22   DOWD resisted the order and requested a supervisor to help clarify the

23   ordinance. The assembled crowd cheered but without other cause or concern the

24   officer exited his vehicle and immediately placed DOWD in handcuffs. DOWD

25   insisted that the rules were not clear regarding performer spaces, and that the

26   CITY had recently amended the rules regarding that space, as DOWD had

27   attended the City committee hearing to approve those changes. When the

28   supervisor, the patrol sergeant , arrived, DOWD was released without citation,

16

1  but on the condition that he leave immediately and his particulars were recorded

2  from his legitimate government ID.

3  40. Two weeks later, on Aug 29, the same scenario unfolded with the same

4  patrol officer. When ordered to quit, DOWD asked the officer to write the

5  citation so that DOWD could have a day in court to decide the issue, and with

6  that citation DOWD would quit the activity. The officer immediately exited the

7  vehicle and informed DOWD that he would be taken straight to jail if he did not

8  comply, but on the grounds that DOWD did not carry California identification.

9  The officer did not examine any identification on this occasion and at this time.

10 He also threatened to 'take you down' physically during the arrest. Not wishing

11 to endure the said threats, DOWD succumbed to the orders and left immediately.

12 The viewing public at that time were dispersed.

13 CONTENT BASED ENFORCEMENT

14 41. Plaintiff JESSE BROWN is a street artist who also conducts P-zone activity

15 on the Boardwalk. "JESSE" occupies a designated space and is actively

16 promoting a nearby medical facility by displaying a four foot sign with images

17 and text, and by passing out flyers to members of the public. Police and City

18 parks staff have ordered him on more than one occasion to take down the sign,

19 because it has a 'commercial nature'. This is a content based decision made on

20 JESSE while he is conducting permitted activities within the P zone.

21 42. Other vendors in the P-zones have been ordered by police to remove NAG

22 Champa incense from their tables because it is commercially packaged and not

23 made by hand. This is a content based determination and there is no restriction

24 in the P-zone on any merchandise except food. The only requirement is that the

25 activity is conducted on a donation basis.

26 REASONABLE TIME PLACE AND MANNER

27 43. The PROGRAM RULES restrict any and all activity in a designated space to

28 the hours of 9a.m. to sunset. The sunset condition is not reasonable. Sunset time

1  changes every day and on many days thick marine layers on the beach prevent
2  the visual observation. Sunset on Venice Beach is a key attraction, and many
3  visitors will observe the sunset, then will make their way out of the park and
4  along the Boardwalk. It is not reasonable to have expressions completely vacate
5  the spaces by sunset which the ordinance proscribes and while the public still
6  congregates in the area. Other parks in the City close one hour after sunset,
7  including  Dearborn Park, Ernest E. Debs Regional Park, Hansen Dam
8  Recreation Center, Runyon Canyon Park, and Telfair Park. One hour after
9  sunset is reasonable and the public and vendors will and do naturally make their
10  way out during this one hour period as night and darkness begin to pervade the
11  area.

12  DUE PROCESS VIOLATIONS

13  44. While "2008" provides for penalties for the first two violations of this code
14  to be simple "infractions", the PROGRAM RULES do go much further than the
15  ordinance itself proscribes. The RULES mandate that upon a second notice of
16  violation the permit holder is suspended from using the space, suspended from
17  the 'next' lottery period, and suspended from any "walk-on' use of any spaces
18  during that next period. It is effectively a ban from the Boardwalk, and is
19  threatened by police as such. The rules though do also state in part "..If LAPD
20  issues a criminal citation to a permit holder while in a permitted space, it will be
21  treated as an administrative violation under the three-step enforcement plan
22  *upon conviction or bail forfeiture*. Unfortunately the CITY has enforced these
23  provisions before convictions or bail forfeitures have been recorded.

24  45. Plaintiffs DOWD, PINO and BURRUM were denied entry to the lottery on
25  August 17, 2009 by City officials who had their names on a list supplied by the
26  police. Plaintiff BURRUM had three live citations however none had been
27  addressed in court, and no determinations had been made on the outcomes.
28  BURRUM was informed that he was barred for a whole year due to his three

18

1  citations. DOWD and PINO had two citations on record each, but none had even
2  progressed to an arraignment even, at the time of the suspension.
3  DOWD, BURRUM and PINO stayed off the Boardwalk for a week for fear of
4  arrest or further loss of entitlement.
5  FIRST COME FIRST SERVED PERFORMER
6  46.  Plaintiff DOWD has been cited at 8.45 a.m. while waiting for a first come
7  first served performer space which allows performances at 9a.m.  DOWD was
8  not setting up, taking down or using the space as the ordinance describes: G (2)
9  (f). He was simply waiting, in fact, DOWD was not even present in the space
10  but was nearby across the Boardwalk. This performer space is designated first
11  come first served, and while not conducting any activity, DOWD was simply
12  registering his presence nearby to qualify under the first come first served
13  requirement. The space in question was also marked incorrectly at that time and
14  has since been repainted correctly by the CITY subsequent to this citation date.
15  This citation is one of the two citations which CITY used to ban DOWD for one
16  week.
17  PLAINTIFFS HAVE TO QUIT THEIR EXPRESSION
18  47. SALTSBURG has quit performing at Venice Beach since very shortly after
19  the introduction of "2008". SALTSBURG is a spontaneous performer and has
20  been harassed by the police for performing on a street, but has also been
21  harassed by other vendors and performers who wish to remove him from a
22  certain location so they themselves can occupy it. DOWD has persevered
23  although after some short breaks away from the chaos which revolves around
24  these rotating performer spaces, DOWD has finally quit performing at Venice
25  Beach after enduring a Labor Day weekend filled with uncertainty, inconsistent
26  rules and orders from the police, and confrontations and arguments with non-
27  musician street performers who also like to take away the spaces already
28  occupied by these Plaintiffs. Some of these other performers have a thug

1  mentality, and often intimidate musicians into giving up their time and space

2  within that rotating space.

3  48. The police have ordered Plaintiffs not to step foot outside of the marked

4  lines during a performance or they will be cited. Police have ordered Plaintiffs

5  not to approach the outdoor café patrons after a show in order to ask for

6  donations and offer CD's. Police have sent undercover vice officers to conduct

7  undercover 'transactions' with performers, whilst the performer is in the middle

8  of a song. Information from that undercover officer has then been used to cite

9  performers for 'sales' or 'donation' breaches. DEMIAN has been forced to quit

10  his expression at times, because upon arrival at the Boardwalk, he finds all

11  spaces filled, and the queue of waiting performers would stretch beyond sunset,

12  whereupon his performance would be in violation of the rules.

13  SUMMARY OF "2008"

14  49. Ordinance is void for vagueness because it uses terms like "inextricably

15  intertwined" without specific guidelines to help authorities determine what this

16  phrase means and how it should apply. Street performers with amplifiers are

17  restricted to only five blocks along the entire Boardwalk of seventeen blocks so

18  lack an ample alternative means of communication when those five blocks are

19  also filled with non amplified vendors and inextricably intertwined, and

20  sculptors, painters, and photographers allowed in by the CITY. Scrutiny of

21  enforcement uncovers continual problems with application even after a full year

22  of implementation, resulting in due process violations and First Amendment

23  denials to selected individuals. Plaintiffs seek declaratory judgment, permanent

24  injunction, and damages.

25

26  **Part. 2  LAMC 42.15 ("2006")**

27  50.  LAMC Amended Section 42.15 was adopted on Jan 31, 2006, as

28  Ordinance No.177,337  effective March 25, 2006. ("2006") and then was

1  suspended from the code in July 2007, when CITY introduced an ordinance to

2  repeal provisions of "2006". Plaintiffs BROWN, DEMIAN, SALTSBURG,

3  TURNER and JESSE were all restricted in their activities under the terms of the

4  2006 ordinance, and do seek damages, and declaratory relief to prevent the re-

5  introduction of those provisions suspended. There exists no guarantee from the

6  CITY that it will not re-introduce those provisions. While the CITY did prepare

7  an ordinance to repeal offending provisions of the 2006 ordinance, and sent it to

8  City Council for approval on July 13, 2007, the Council did continue the item

9  while relating status conferences continued in the district court, but when

10  approving the newer 2008 ordinance on March 26,2008, the CITY withdrew the

11  ordinance repealing those faulty provisions of "2006". The provisions  have still

12  not been repealed.

13  VOID FOR VAGUENESS

14  51. The BOARD of Recreation and Parks introduced a set of Program Rules by

15  which to enforce 177337, which were revised on March 15, 2006. ("2006

16  RULES").  In the opening paragraph of the 2006 RULES is stated: "…Section

17  42.15…. "prohibits" vending of any items having nominal utility apart from

18  their communication ….". In the second paragraph the opposite is maintained

19  and these same items ARE allowed: "Section 42.15(c) "allows" vending of

20  items that are inherently communicative and have nominal utility….". Paragraph

21  two then continues on to state that the items which may not be vended are items

22  which have MORE THAN nominal utility. These are three different statements

23  regarding utility. The terms 'inherently communicative' and 'nominal utility' are

24  vague. This language allows CITY officials to make a discretionary finding as to

25  the inherent communication versus the amount of utility of any particular item

26  of merchandise. While the ordinance lists items which it considers will fall into

27  this description, it lacks guidelines to adequately explain the connection between

28  these standards and how they can be enforced on items not listed. The ordinance

21

1   also deems an item to be 'more than nominal utility' and prohibited, if it has a

2   common dominant non-expressive use. A T-shirt may have a dominant use as

3   clothing, however the communicative value could be a far greater use for the

4   buyer and the vendor.

5   52. **Subsection (c) Exemptions.**  Subsection (c) which defines the activities

6   which are exempted from the overall ban on beach vending provides this

7   exemption: "Any individual or organization that vends the following items,

8   which have been created, written or composed by the vendor: books, cassette

9   tapes, compact discs, digital video discs, paintings, photographs, sculptures or

10  any other item that is inherently communicative and has nominal utility apart

11  from its communication." This language requires a CITY official to make a

12  determination on inherent communication of an item, and a further

13  determination of utility apart from the communication. This is impermissibly

14  vague. Subsection (c) (2) continues : "Although an item may have some

15  expressive purpose, it will be deemed to have MORE THAN nominal utility

16  apart from its communication if it has a common and dominant non-expressive

17  purpose." .

18  <u>PERFORMERS ARE EXEMPT FROM VENDING BAN</u>

19  53. **Subsection (c)(3)**  provides that performing artists and musicians are

20  exempt from the vending ban, however Plaintiffs DEMIAN, BROWN and

21  SALTSBURG were informed that vending or display of their T-shirts or any

22  other item with more than nominal utility, was prohibited, regardless of the

23  communicative quality, or even by the exemption on performers as provided in

24  the subsection. Plaintiffs above were ordered to remove their T-shirts from the

25  Boardwalk. DEMIAN has a shirt with his name and slogan "Street Smart" upon

26  it, SALTSBURG's T-shirt carries his character name, "ZUMA DOGG" and his

27  image, and BROWN displays shirts with African American images and political

28  messages inscribed upon same. Plaintiff JESSE, while not exempt as a

<div align="center">22</div>

1  performer, was prohibited from selling or displaying his inscribed skateboard
2  decks, because they were deemed to be more than nominal utility, regardless of
3  the communication in the artwork inscribed upon them. They were ordered
4  removed from display.
5  SPONTANEOUS EXPRESSION
6   54.  **Subsection (e)**  This section is identical to Section 1 D of ordinance
7  176270 ("2004" ordinance) and describes the mandatory requirement of a permit
8  for an individual to receive money or accept donations in relation to expression
9  on the Boardwalk in an allocated space. The exception was added in "2006" that
10  an individual or organization may conduct exempted activities without a permit
11  in an unoccupied space, but only after 12 midday. It is a prior restraint for a
12  visiting performer, artist or politician, to be confronted with a legal contract to
13  sign, accompanying rules and regulations to follow, the payment of a fee, and
14  the issuance of a photo I.D., in order to display, communicate or otherwise
15  conduct some expression when confronted with empty spaces on the
16  BOARDWALK prior to 12 noon. This condition completely annihilates any
17  spontaneous expression which an individual may otherwise have conducted
18  absent these rules.
19   55.  Political, religious, philosophical and ideological expression can often be
20  spontaneous, and the requirement to purchase a PERMIT with a photo I.D. is a
21  fundamental restriction on First Amendment freedom of speech in a public
22  forum which is open from 9.am.
23  Plaintiff TURNER was cited three times under "2006" because he was
24  conducting spontaneous expression, which involves riding a small unicycle, and
25  making political and social statements to the public in a large public area
26  adjacent to the BOARDWALK. He was ordered to only conduct his expression
27  within a 'performer' space as designated and allocated by the CITY under
28  "2006".

23

69

DISPLAY IS PERMITTED

56.  Nowhere in the ordinance does it state that these "prohibited" items cannot be displayed. Permit holders are permitted to display their goods, and in fact proselytize the benefits of their products to the public. They are only restricted from selling them. If Plaintiffs' expression has been 'permitted' by the CITY, evidenced by the issue of Plaintiffs' expression permits, then this 2006 ordinance clearly does parcel out the commercial aspect of the speech. The CITY has  made arrests on individuals for display only. Vendor Michael Hunt was arrested in April 2006 for displaying items, as was another artist "Ibrahim", who was displaying artworks.

OVERBROAD

57.  LAMC 42.15  "2006" is not a reasonable time, place and manner restriction on protected speech because it is not narrowly tailored and it substantially burdens more speech than necessary to achieve the stated objectives of the CITY. "2006" requires permits be held for those individuals soliciting money and does not require a permit for individuals not soliciting money. There is no evidence that the solicitation of donations is more burdensome to the CITY'S interests than those activities that do not solicit.

**Part 3.  RULES OF DECORUM**

INTRODUCTION

58. The CITY of Los Angeles has a legislative body, the City Council, which does enact and enforce [through its designated servants] not only its ordinances within its codes, but also its Council Rules which in most part apply to its public meetings. The rules pertaining to the 'conduct' of those addressing the Council are called the Rules of Decorum and were amended in July 2009. Plaintiffs DOWD and SALTSBURG allege that these RULES are impermissible prior

24

1  restraints on free expression, are content based, vague, and thus do provide for

2  discretionary enforcement based on subjective analysis by the City Council

3  members. These RULES have and will continue to be used to chill, intimidate,

4  and deny free political expression to these Plaintiffs, without declaratory and

5  injunctive relief from the Court. The RULES implicate First Amendment rights,

6  and alleged breaches can result in criminal penalties, so RULES should be

7  subject to increased scrutiny with regard to constitutionality. Plaintiffs will also

8  make an as-applied challenge to the RULES.

9  FACTS

10  59. DOWD and SALTSBURG have been attending City Council meetings since

11  March 2006, after the CITY adopted the 2006 beach vending ordinance

12  complained about herein. These Plaintiffs have attended over one hundred

13  meetings per year in that time. Plaintiffs originally intended to redress the

14  government regarding the LAMC 42.15 ordinance, but after attending meetings

15  and examining agendas, Plaintiffs began to address other items out of concern

16  for the state of the City and its residents. SALTSBURG'S concern has

17  manifested into a run for Mayor of Los Angeles in 2009, where he ended up

18  fourth of ten candidates, and he is currently a candidate for a vacant City

19  Council seat in a current special election. DOWD and SALTSBURG have

20  addressed the City Council on many matters including Federal grant money, the

21  City budget, job cuts, the CITY'S loss of its pension funds, early retirements,

22  cuts in services, fee waivers, water and power rates, parking structures, liquor

23  licenses, tract maps for urban density, solar power, schools, education and

24  pollution, to name a few. While these Plaintiffs do address some items

25  favorably, many items deserve unfavorable reviews or comments, and it is

26  during these types of comments where Plaintiffs are unduly interrupted and

27  admonished or picked on based on the content of their speech, not on the

28  behavior of the speaker.

60. Rule 12 of the RULES OF DECORUM is being used to silence, interrupt, interject, distract, repress, chill, profile, and ultimately ban these two Plaintiffs while speaking out to the legislators in protest at the violations on the beach, and about other matters of concern to these Plaintiffs within the City of Los Angeles and on the City agenda. Many times a council member has interrupted the speaker, or the order of the meeting, and claimed that something said, or even being worn, was causing a 'disruption', even though that speech or activity may be protected. Plaintiffs have often been denied the right to speak at these public meetings.  Others not before this court have also been subjected to discretionary enforcement under these RULES.

61.  DOWD is currently barred from speaking at the City Council for thirty meetings based entirely on language which he used during his allotted comment time. DOWD was voted out for the maximum term allowed by the RULES. DOWD'S offending language was blurted out during comments he was making pointing out his increasing frustration with the CITY using vague terms in its beach vending ordinance, and not making any attempt to correct that ordinance. The Council president maintains that use of certain words, or the wearing of certain items of clothing, may cause a disruption if a Councilmember chooses to stand up and claim offense at the word or costume. This has happened on numerous occasions. An African American man wearing a KKK costume as part of his political protest was ordered to "remove" the hood, after a councilmember claimed he was "threatened" by it. When told by the President that only a disruption could be acted upon, the Councilman responded that it was not a disruption, but that he felt threatened by the man. The man was sitting quietly in the chambers in a peaceful and non violent way. The meeting was not disrupted at all until the Councilman stood up to claim he was "threatened".

62. SALTSBURG was banned from speaking at Council for two meetings after he referred to the Council as "losers" during a comment he was making about

the seven billion dollar lost pension funds. SALTSBURG is often interrupted and told his voice is too loud, even though Council chambers is a very large room, and the CITY has sophisticated sound amplification systems and an engineer broadcasting on Channel 35, and there are side conversations and general noise which a speaker wishes to be heard over.

STATE LAW REQUIRES PUBLIC COMMENT

63. Section 8. of the Council RULES states: *"The Brown Act requires the Council to provide an opportunity in regular meetings for members of the public to address it on any non-agenda item generally considered to be a municipal affair and within the subject matter jurisdiction of the Council. This shall be referred to as "general public comment."..."*

It was during this segment of the meeting in which DOWD was removed for his comment, and subsequently voted out by the Council, under Rule 12.

DECORUM

64. Section 12 of the RULES states , in part: "12. Rules of Decorum: ***Changes adopted by the City Council on July 29, 2009***

a. Rules of Decorum. ...........Persons addressing the Council shall not make personal, impertinent, unduly repetitive, slanderous or profane remarks to the Council, any member of the Council, staff or general public.......".

The words slanderous, and profane, are impermissible. A comment could only be determined "slanderous" by a Court, furnished with facts relative to the alleged slander. The RULES allow the Council president, at his discretion to make a determination of "slander" and issue a warning or remove the speaker. The meeting is public and recorded, and there does exist already a mechanism available for an aggrieved party to make a claim against a speaker, in a civil action. "Profane" is also a vague term, and the RULES lack any guidelines to help determine which specific language falls into this category. While certain words may be unsavory, their use in an expressive way should not be chilled if

27

73

1  that expression is the preferred choice of the speaker to successfully make the
2  point at hand.

3  65. Rule 12 continues in part with : " nor utter loud, threatening, personal or
4  abusive language, nor engage in any other disorderly conduct that disrupts,
5  disturbs or otherwise impedes the orderly conduct of any Council meeting."
6  The words "loud" and "abusive" invite subjective decision making without any
7  specific guidelines as to when a speaker has become too loud, or exactly what
8  kind of language constitutes "abusive" language. Many comments directed at a
9  poor performance of the Council could easily be construed as "abusive". Both of
10 these terms can easily be used by Council President to interrupt or interfere with
11 delivery of speech.

12 ENFORCEMENT

13 66. Section 12 b of the RULES states:  " … b. Enforcement of Decorum.
14 At the discretion of the Presiding Officer or upon a majority vote of the Council,
15 the Presiding Officer may order removed from the Council Chamber any person
16 who fails to observe these rules of decorum, including committing any of the
17 following acts of disruptive conduct in respect to a regular, adjourned regular or
18 special meeting of the City Council. Disorderly, contemptuous or insolent
19 behavior toward the Council or any member thereof, tending to interrupt the due
20 and orderly course of said meeting;" .

21 Here the words "contemptuous", and "insolent" are impermissibly vague and
22 lack any express guidelines as to their interpretation or application. They are
23 purely subjective terms, and could easily be used to eject or disrupt a speaker
24 making comments concerning the performance of a councilmember or a City
25 department or service under the authority of the Council or a member. It would
26 only take a councilmember to stand and claim insolence or contempt, and thus
27 claim a 'disruption' which then 'interrupts' the due and orderly course of the
28 meeting. Plaintiffs contend that the Councilmembers create the disruption to the

28

meeting by interrupting the speakers with these kinds of claims based on this vague terminology.

LAWFUL AUTHORITY ALREADY EXISTS

67. Part (b) of Enforcement continues: " These enforcement provisions are in addition to the authority held by the Sergeant at-Arms to maintain order pursuant to Rule 80 and pursuant to his or her lawful authority as a peace officer." The RULES then clearly indicate that there does exist already lawful authority with the sergeant-at-arms attending the meeting, with which to take action against actual disturbances that violate the peaceful and civil conduct of a public meeting such as the City Council.

PENALTIES APPLIED WITH VAGUE AND SUBJECTIVE TERMS

68. Section 12 c of the RULES states: " c. Penalties. Any person who has been ordered removed from a meeting may be charged with a violation of Penal Code Section 403, or other appropriate Penal Code or Los Angeles Municipal Code sections. In addition, any person so removed on the basis of disruptive conduct described above may not be allowed to address the Council for up to a maximum of thirty (30) meeting days of the Council during which the Council has convened in regular session. The period of prohibition from addressing the Council will be determined by the Presiding Officer, or the Council upon a vote, based on the number and severity of prior incidents of disruptive conduct." DOWD was issued the maximum penalty under the RULES, a thirty meeting denial of speech rights, based on "the number and severity of prior incidents" as the RULES provide. "Severity" is the vague term here, and is completely subjective. What may be a severe incident to one person, may not at all be severe to another. When DOWD was voted out for thirty meetings, that vote was taken instantly, by a motion introduced on the floor of the Council. No numbers of prior incidents, or examination of severity were introduced before the vote. The vote was not unanimous.

29

UNCONSTITUTIONAL AS-APPLIED

BOOING IS CAUSE FOR REMOVAL

69. On one occasion DOWD was removed from the meeting without warning for booing a councilman at his introduction to the floor. The councilman claimed foul, and the President ordered DOWD removed from the chambers for the day. No similar action is or was ever taken on persons who cheer or clap or make other spontaneous noises especially if those noises are of a supportive nature. DOWD'S spontaneous and momentary comment was considered a 'disruption', although there would have been no disruption to the meeting if the Councilman had just accepted the boo, along with the applause.

RULES PROTECT COUNCIL, BUT NOT PUBLIC

70. Rule 9 of the RULES states: " *9. No person shall be permitted to interrupt Councilmembers or the Clerk during a Council meeting.*"  Plaintiffs note that there is a rule protecting interruptions of Councilmembers, but no protection against interruptions on public speakers. Many times one particular Councilmember has jumped up out of order and interrupted DOWD or SALTSBURG based on the content of the speech, not on any kind of disruptive behavior. The majority of these interjections are dismissed after a short discussion between President and member, however the clock still ticks away at the Plaintiff's time, and the flow of the speaker comment is lost. The persistent nature of these kinds of interruptions can drive up the level of frustration and consequently, the speaker can become more animated and forceful with his tone and language. This can result in a perceived breach of the rules, and allow the President to conclude the speaker's time based on that breach.

INTERRUPTED TO FILL IN A CARD COMPLETELY

71. Council rules only require that a speaker card contain a name or moniker to identify the speaker and to call that speaker in order. DOWD attended a recent

1  CITY committee meeting where amendments to LAMC 42.15 2008 were being
2  discussed and filled his card with his name and the item number.
3  DOWD was called to speak, however only thirty seconds into a most important
4  comment, the committee chair, the same councilmember responsible for
5  interruptions in chambers, stopped DOWD mid comment and told him he
6  needed to complete all the information requested on the speaker card.
7  [Information includes address and phone number, among other details]. DOWD
8  had to inform the chair that these additional bits of information were not
9  'required' according to the City attorney. The committee chair responded again
10  that he "liked" to have them all filled in.
11  The result is a deliberate disruption to the flow and train of thought of the
12  speaker. Because DOWD is a political activist who distributes information,
13  written and verbally, to other permit and non permit holders, regarding the status
14  of local litigation and appeals decisions which can directly affect the beach
15  environment, and because he stands up for the rights of vendors and performers,
16  he is often targeted with this kind of harassment
17  RACIAL SENTIMENT IS PROHIBITED
18  72. A speaker who referred to himself using a racial epithet was removed based
19  on the utterance of the word, and not by any action or threat towards the public
20  or the City Council during that speaker's comment period. The CITY has made
21  a public resolution to ban the use of the word in the City of Los Angeles,
22  however it is largely a symbolic gesture, and not grounds at any time to remove
23  a speaker, based on that choice of language when required to illustrate the
24  speaker's point, which in that instance was the ongoing discrimination against
25  beach vendors.
26  NOT ALLOWED TO SAY CO-PLAINTIFFS NAME
27  73. DOWD is a co-plaintiff in a district court case parallel and preceding this
28  current action. His co-plaintiff in that action is Michael Hunt. The defendant is

1  the CITY. DOWD often speaks about that action but DOWD has been warned

2  that he will be removed if he refers to his co-Plaintiff by his name "Mike Hunt".

3  Mike is a family name used by close friends but when DOWD has referred to

4  him with that name, he has been ordered to refer to him as Michael Hunt or Mr

5  Hunt, or face removal from the meeting.

6  PROFANITY ACCEPTABLE IF "EXITING"

7  74. DOWD was removed from speaking at City Council for thirty meetings,

8  because of his use of a "profanity". DOWD did however conduct himself in an

9  identical fashion to a speaker who used the same "profanity" a few weeks

10  earlier, but without admonishment from the CITY. That speaker used the

11  "profanity", and then proceeded to leave the podium. When DOWD questioned

12  the lack of enforcement during his next public comment, the attorney responded

13  on the record, that because the "profanity" was uttered and then the speaker was

14  exiting, then it would be "more of a disruption to admonish, than not."

15  DOWD also began exiting immediately after his utterance, however Council did

16  deem it necessary to open debate about DOWD, about his utterance, and then

17  moved to deny DOWD for thirty meetings, and take that vote. DOWD was

18  exiting because he was already flustered by the interruption prior to his

19  utterance, and because his utterance was significant enough to satisfy DOWD'S

20  requirement that the message be delivered. DOWD left the building without

21  need for police escort and no other action was taken.

22  DISRUPTIONS ARE TRANSFERABLE

23  75. The Council President holds the discretion to issue "warnings" to members

24  of the public who are in breach of the RULES. SALTSBURG was arrested and

25  charged under PC403 even though he himself was not in breach of that code.

26  Other public speakers, who had spoken before SALTSBURG, had elicited

27  warnings from the Council president. Then SALTSBURG delivered a rather

28  animated public comment, and did not attract any warnings. Upon returning to

his seat, he was approached by a sergeant-at-arms, who told him to "Be quiet". SALTSBURG responded with "Relax. I'm not doing anything". The officer then immediately grabbed SALTSBURG, placed him in handcuffs and marched him into custody and charged him with "disturbing the peace".

CONTEMPT FOR CIVIL RIGHTS ACTIONS

76. Councilmembers have risen and stated on the record that civil rights actions are frivolous, and lack credibility [made in reference to prior 42.15 challenge by HUNT and DOWD], and ought not be taken seriously. All plaintiffs strongly disagree, and urge the Court to treat civil rights claims under Section 1983 with the respect and scrutiny that the law and Constitution demand. Plaintiffs have been disenfranchised, demoralized and dehumanized by the enforcement of these codes and rules complained of herein. Plaintiffs do not make these allegations in fun. Real criminal sanctions, and loss of speech rights are involved. Plaintiffs are street performers and artists and political advocates who have standing to make these allegations. Plaintiffs seek swift and conclusive relief to satisfy their requests.

## FIRST CLAIM FOR RELIEF

### Unconstitutional Statutes

### (Violations of First, Fifth, and Fourteenth Amendments: 42 U.S.C. §1983)

77.   The above allegations in paragraphs 1 through 57 above are incorporated into the First Claim for Relief as though fully set forth herein.

78.   LAMC §42.15 as amended in 2008 (Ordinance 179807) is an unconstitutional statute. The ordinance and the related Public Expression Permit Program violate the First Amendment because they contain provisions which constitute impermissible prior restraints on public expression in a quintessential public forum. The terms in these provisions are vague and lack adequate

33

standards or guidelines for enforcement. LAMC 42.15 [2008] is not a reasonable time, place and manner restriction, because the means chosen are substantially broader than necessary to achieve the government's interest.

79.  LAMC Sec. 42.15 as amended in 2006 (Ordinance 177337) is an unconstitutional statute. §42.15 (2006) and the related Public Expression Permit Program Rules violate the First Amendment because they contain provisions which constitute impermissible prior restraints on public expression in a quintessential public forum. The terms in these provisions invite content-based decision making, lack required procedural safeguards, and contain vague terminology. The CITY does not have adequate standards or guidelines to limit the unbridled discretion of CITY officials in enforcing this ordinance.

80.  LAMC §§42.15 (both 2008 and 2006), their associated Program Rules, and the challenged sections of LAMC 63.44, violate Plaintiffs' right to freedom of speech protected by the First Amendment and made applicable to the States and Local Government by 42 U.S.C. 1983. The acts complained of herein were directed towards intimidating Plaintiffs' from the lawful exercise of their Constitutional rights.

81.  The failure to enact laws that give reasonable notice of criminally penalized activities and the failure to adopt precise standards and guidelines by which to guide CITY officials in applying "2008" and "2006" violates Plaintiffs' rights to Due Process under the First and Fourteenth Amendments.

82.  As a consequence of these actions, Plaintiffs have been impeded in their efforts to carry out constitutionally protected activities as described above, and, accordingly, have and will suffer damages as a result of Defendant's actions.

83.  Absent relief from this Court, Plaintiffs will suffer irreparable harm. Plaintiffs' right to freedom of speech will continue to be violated. There is a

1  very real threat of imminent future violations of Plaintiffs' First Amendment
2  rights.

3      84.   There is an actual controversy now existing between Plaintiffs and
4  Defendant concerning the Venice Beach permit scheme, including whether
5  Plaintiffs will continue to be threatened with criminal prosecution if their
6  intended activities are deemed by the City to not be in compliance with all
7  applicable ordinances and their implementing rules and regulations.

8      85.  Plaintiffs have suffered damages as a direct result of the actions of the
9  DEFENDANT. Plaintiffs have lost their opportunity to perform freely on the
10  Venice Boardwalk. DOWD, PINO and BURRUM were "removed" from the
11  lottery without lawful reason. All plaintiffs [except JESSE] have suffered direct
12  monetary loss from lack of performance time. DOWD, BROWN, PINO,
13  BURRUM, SIMS, and TURNER have been criminally cited. Prosecutions are
14  pending and imminent.

15

16              **SECOND CLAIM FOR RELIEF**

17             **Injunctive and Declaratory Relief**

18      **RULES OF DECORUM ARE UNCONSTITUTIONAL**

19      86.   The above allegations in paragraphs 58 through 76 above are
20  incorporated into the Second Claim for Relief as though fully set forth herein.

21      87.  The Rules of Decorum and their enforcement violate the First
22  Amendment because they contain provisions which constitute impermissible
23  prior restraints on  speech. The terms in these provisions are vague and lack
24  adequate standards or guidelines for enforcement. There exists unbridled
25  discretion of CITY officials in enforcing these RULES.

26      88. The RULES OF DECORUM violate Plaintiffs' right to freedom of speech
27  protected by the First Amendment and made applicable to the States and Local
28  Government by 42 U.S.C. 1983. The acts complained of herein were directed

                                35

1    towards intimidating Plaintiffs' from the lawful exercise of their Constitutional

2    rights.

3        89.   The failure to enact laws that give reasonable notice of criminally

4    penalized activities and the failure to adopt precise standards and guidelines by

5    which to guide CITY officials in applying the RULES violates Plaintiffs' rights

6    to Due Process under the First and Fourteenth Amendments.

7        90.   As a consequence of these actions, Plaintiffs DOWD and

8    SALTSBURG have been impeded in their efforts to carry out constitutionally

9    protected activities as described above, and, accordingly, have and will suffer

10    damages as a result of Defendant's actions.

11        91.   Absent relief from this Court, Plaintiffs will suffer irreparable harm.

12    Plaintiffs' right to freedom of speech will continue to be violated. There is a

13    very real threat of imminent future violations of Plaintiffs' First Amendment

14    rights.

15        92.   There is an actual controversy now existing between Plaintiffs

16    DOWD and SALTSBURG and Defendant CITY concerning the ability to speak

17    freely at these public meetings, including whether Plaintiffs will continue to be

18    threatened with criminal prosecution if their intended activities are deemed by

19    the City to not be in compliance with all applicable rules and regulations.

20        93.   Plaintiffs have suffered damages as a direct result of the actions of the

21    DEFENDANT. Plaintiffs have lost their opportunity to speak freely without

22    interruption or admonishment. SALTSBURG has been charged and convicted

23

24

25    **PRAYER FOR RELIEF**

26    **Wherefore, Plaintiffs request judgment as follows:**

27        1. For a permanent injunction enjoining DEFENDANT, its agents, servants,

28    employees, and successors in office, and all persons acting in cooperation with

the CITY, or at the CITY'S direction or control, from enforcing the ordinances and regulations described herein and above.

1. For a declaratory judgment that LAMC §§ 42.15 (both 2006 and 2008), the additional "Program Rules" and the challenged sections of Council Rules violate the First, Fifth and Fourteenth Amendments to the United States Constitution.

2. For a declaratory judgment that LAMC §§ 42.15 (2006 and 2008), and the challenged sections of Council Rules violate Article 1 § 2 of the California Constitution.

3. For a declaratory judgment that LAMC §§ 42.15 (2008), and the challenged sections of Council Rules are "unconstitutional as-applied".

4. For an Order directing that all Notices of Violations and citations issued pursuant to a purported violation of LAMC §§ 42.15 since January 31, 2005 to the present date, and COUNCIL RULES, through the enforcement of these ordinances and their associated PROGRAM RULES, be expunged in any and all files maintained by the CITY.

5. For damages against the CITY as permitted by law and according to proof at trial, in favor of Plaintiffs

6. For any further relief as this COURT deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial on their damages claim.



DATED: Sept. 15, 2009     Respectfully submitted,

MATTHEW DOWD,
PETER DEMJAN,
EDWARD LA GROSSA,
ANTHONY BROWN,
NATHAN PINO,
WILLIE LEE TURNER,
DAVID SALTSBURG,
THOMAS BURRUM JNR,
MARVIN SIMS
JESSE BROWN,
LOUIE GARCIA,
RENE CASTRO.

plaintiffs in pro per

Matthew Dowd                      Peter Demjan

Edward LaGrossa                   Anthony Brown

Nathan Pino                       Willie Lee Turner

David Saltsburg                   Thomas Burrum Jnr.

Jesse Brown                       Louie Garcia

Rene Castro                       Marvin Sims

84

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☒) | DEFENDANTS |
|---|---|
| MATHEW DOWD et al. | CITY OF LOS ANGELES |

| (b) County of Residence of First Listed Plaintiff (Except in U.S. Plaintiff Cases): | County of Residence of First Listed Defendant (In U.S. Plaintiff Cases Only): |
|---|---|

| (c) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☒ No   ☐ MONEY DEMANDED IN COMPLAINT: $ JURY

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

28 USC 1983.   UNCONSTITUTIONAL STATUTES

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities /Exchange | ☐ 190 Other Contract | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 195 Contract Product Liability | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 630 Liquor Laws | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 196 Franchise | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 640 R.R. & Truck | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | **REAL PROPERTY** | | ☐ 445 American with Disabilities - Employment | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 210 Land Condemnation | | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 220 Foreclosure | | ☒ 440 Other Civil Rights | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 230 Rent Lease & Ejectment | | | | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 240 Torts to Land | | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 245 Tort Product Liability | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 290 All Other Real Property | | | | ☐ 871 IRS-Third Party 26 USC 7609 |

**VIII(a). IDENTICAL CASES:** Has this action been previously filed and dismissed, remanded or closed? ☒ No  ☐ Yes

If yes, list case number(s):

| FOR OFFICE USE ONLY: | Case Number: | CV09-6731 |
|---|---|---|

CV-71 (12/04)                                    CIVIL COVER SHEET                                    85 Page 1 of 2

FOR OFFICE USE ONLY

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW DOWD, PETER DEMIAN, EDWARD LAGROSSA, ANTHONY BROWN, NATHAN PINO, WILLIE LEE TURNER, DAVID SALTSBURG, *ZUMA DOGG*, THOMAS BURRUM JNR, MARVIN SIMS, JESSE BROWN, LOUIE GARCIA, RENE CASTRO  **PLAINTIFF(S)** | CASE NUMBER  $CV09-6731$ $AHm$ $(RZ)$ |
| v.<br>CITY OF LOS ANGELES   **DEFENDANT(S).** | **SUMMONS** |

TO:   THE ABOVE-NAMED DEFENDANT(S):   CITY OF LOS ANGELES

YOU ARE HEREBY SUMMONED and required to file with this court and serve upon plaintiff's ~~attorney~~ _____, whose address is:

10 ½ 27th Place
VENICE CA 90291

FOR OFFICE USE ONLY

an answer to the ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim which is herewith served upon you within __70__ days after service of this Summons upon you, exclusive of the day of service. If you fail to do so, judgement by default will be taken against you for the relief demanded in the complaint.

Clerk, U.S. District Court

Dated: __9/16/09__

By: _____
Deputy Clerk

(Seal of the Court)

SEAL

FOR OFFICE USE ONLY

ORIG.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☑)
MATTHEW DOWD et al.

**DEFENDANTS**
CITY OF LOS ANGELES

(b) County of Residence of First Listed Plaintiff (Except in U.S. Plaintiff Cases):

County of Residence of First Listed Defendant (In U.S. Plaintiff Cases Only):

(c) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify): ☐ 6 Multi-District Litigation ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No ☐ **MONEY DEMANDED IN COMPLAINT: $** JURY

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 USC 1983. UNCONSTITUTIONAL STATUTES

**VII. NATURE OF SUIT** (Place an X in one box only.)

**OTHER STATUTES**
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 890 Other Statutory Actions
☐ 891 Agricultural Act
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Info. Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Fed. Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury-Med Malpractice
☐ 365 Personal Injury-Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**TORTS PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**CIVIL RIGHTS**
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/Accommodations
☐ 444 Welfare
☐ 445 American with Disabilities - Employment
☐ 446 American with Disabilities - Other
☒ 440 Other Civil Rights

**PRISONER PETITIONS**
☐ 510 Motions to Vacate Sentence Habeas Corpus
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus/Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**FORFEITURE / PENALTY**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety /Health
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS-Third Party 26 USC 7609

**VIII(a). IDENTICAL CASES:** Has this action been previously filed and dismissed, remanded or closed? ☒ No ☐ Yes

If yes, list case number(s):

**FOR OFFICE USE ONLY:** Case Number: CV09-6731